**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| **FOREST CITY ENTERPRISES, INC.,** | : | **Case No. 1:07-CV-2383** |
| **Plaintiff / Counter-Defendant,** | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| **v.** | : | |
| **CENTURY JETS, L.L.C.,** | : | <u>**OPINION & ORDER**</u> |
| **Defendant / Counter-Plaintiff.** | : | |


This is a breach of contract action arising out of a dispute over two separate agreements executed on October 1, 2006 between Forest City Enterprises, Inc. ("Forest City") and Century Jets, L.L.C. ("Century Jets") – the "Beechjet Agreement" and the "Hawker Agreement" (collectively, the "2006 Agreements") – whereby Century Jets agreed to provide Forest City, and Forest City agreed to pay for, hundreds of block hours of private chartered jet services at fixed hourly rates.

Both Forest City and Century Jets have filed breach of contract claims against one another, each asserting that the other party was in breach of the 2006 Agreements. (*See* Docs. 12, 15.)[1]  In short, Forest City contends that Century Jets breached the 2006 Agreements by: (1) failing to maintain or base a plane at Burke Lakefront Airport in downtown Cleveland, Ohio ("Burke") for Forest City's use; and (2) failing to maintain an office facility at Burke for Forest City's use. Century Jets, on the other hand, contends that it complied with all of its performance obligations under the 2006 Agreements and that Forest City breached the 2006 Agreements by wrongfully declaring Century Jets to be in default and failing to make required payments.

---

[1]  Forest City also has filed a declaratory judgment claim, seeking a declaration that it is released from any and all further obligations under the 2006 Agreements. (*See* Doc. 12.)

After the close of discovery, the parties waived their right to a trial by jury, and the Court conducted a two-day bench trial and heard closing arguments by counsel on behalf of the parties.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court now issues the following findings of fact and conclusions of law based on a careful consideration of the credibility of the witnesses, the trial record, and the parties' written and oral arguments.

For the reasons articulated in more detail below, the Court concludes that Forest City was in breach of the 2006 Agreements and orders that Forest City pay Century Jets damages in the amount of $1,330,637.50.

## I.      FINDINGS OF FACT[2]

### A.      THE PARTIES

1. Plaintiff / Counter-Defendant Forest City is an Ohio corporation with its principal place of business in Cleveland, Ohio.  Forest City is a publicly-owned real estate development corporation that has real estate interests in several states.  (Tr. 59.)  Forest City's principal witness at trial was Brad Snyder, its Vice-President of Corporate and Strategic Initiatives.  (Tr. 8.)

2. Defendant / Counter-Plaintiff Century Jets is a Delaware limited liability company with its principal place of business in Williamsburg, Virginia.  Century Jets has only two members, both of whom are citizens of Virginia.  Century Jets is in the business of arranging charter flights, utilizing various business planes.  In addition to being based in Williamsburg, Virginia, Century Jets has operational arms in various places in the United States, including an office at the airport in Nashua, New Hampshire.  Century Jets' principal witness at trial was Charles Sonson, one of the company's members, its Manager, and an occasional charter flight pilot.  (Tr. 222-23.)

---

[2]  To the extent testimony contrary to these findings was submitted at trial, the Court expressly finds that such testimony was not credible.

**B.     THE 2004 AGREEMENT AND THE RELATED ESCROW AGREEMENT**

3.  Prior to entering into the 2006 Agreements at issue in this case, Forest City and Century Jets executed a Block Hour Charter Agreement on November 15, 2004 (Ex. 1) (the "2004 Agreement").

4.  Pursuant to the 2004 Agreement, Century Jets agreed to provide Forest City, and Forest City agreed to pay for, a "guaranteed block of 150 hours" of private chartered jet services during an initial one-year term and up to five succeeding one-year "Renewal Terms" at the hourly rate of $3200 for a term total of $480,000.  (*Id.* at ¶¶ 2-3.)

5.  The 2004 Agreement could be terminated unilaterally by Forest City "after the initial one-year term and thereafter after each Renewal Term for any reason."  (*Id.* at ¶ 2.)

6.  During the initial term of the 2004 Agreement, Forest City was required to pre-pay $160,000, or one-third of the one-year term "Contract Rate" of $480,000, to a third-party escrow account in three installments – upon execution of the agreement and on the fourth and eighth month anniversaries of the execution date. (*Id.* at ¶ 4.)  During any subsequent Renewal Terms, Forest City was required to make pre-payments in the same manner as in the initial one-year term.  (*Id.*)  Forest City's pre-payments to the third-party escrow account would then be debited to Century Jets after each charter flight or cancelled charter trip.  (*Id.*)

7.  Paragraph 10 of the 2004 Agreement, titled "Unused Flight Hours," described how Forest City could forfeit any of the 150 block hours of private chartered jet services that it did not utilize in a specified term:

> In the event there are any unused Allocated Hours remaining in [Forest City's] account at the end of the term or any Renewal Term, [Forest City] shall be given an automatic 30 day extension period within which to use the Allocated Hours. Thereafter any remaining unused Allocated Hours shall be forfeited unless the

-3-

Agreement is renewed whereupon the unused hours shall be transferred to the Renewal Term.

(*Id.* at ¶ 10.)

8.  The terms and conditions regarding the third-party escrow account identified in the 2004 Agreement were governed by a separate agreement – the Block Hour Charter Escrow Agreement, also executed on November 15, 2004, by Forest City, Century Jets, and National City Bank of the Midwest (Ex. 2) (the "Escrow Agreement").

C.  **THE PARTIES' PERFORMANCE UNDER THE 2004 AGREEMENT AND THE NEGOTIATIONS LEADING TO THE EXECUTION OF THE 2006 AGREEMENTS**

1.  **Forest City's Chartered Jet Program in 2004**

9.  At the time the parties entered into the 2004 Agreement, Century Jets was one of Forest City's six to eight private chartered jet services providers, through which Forest City flew a total of approximately 500-600 hours per year.  (Tr. 9.)

2.  **Performance Under the Initial Term of the 2004 Agreement**

10.  During the initial term of the 2004 Agreement, Forest City flew its contractually-allocated 150 block hours of private chartered jet services in less than the first calendar year, *i.e.*, prior to November 15, 2005.  (Tr. 228-29, 235; Ex. 1001.)  In fact, Charles Sonson, Century Jets' Manager, testified  – and Forest City does not dispute – that the 150 block hours of the initial term were flown by approximately October 2005.  (*Id.*)  At that time, Forest City renewed the 2004 Agreement for a second one-year term and pre-paid the first deposit of $160,000 to the third-party escrow account.  (*Id.*)

3.  **Forest City Begins Reviews of Its Chartered Jet Program in 2006**

11.  In early 2006, Brad Snyder, Forest City's Vice-President of Corporate and Strategic

-4-

Initiatives, who did not have any prior involvement in Forest City's chartered jet program, and was not involved in the drafting or negotiation of the 2004 Agreement, began an in-house review of the corporation's various contracts for private chartered jet services with the goal of consolidating Forest City's jet-services use to one primary provider.  (Tr. 8-9, 69, 157-59.)

### 4.    Early Negotiations Between Forest City and Century Jets

12.    As part of his review, Mr. Snyder contacted Mr. Sonson and Century Jets during the summer of 2006 to discuss various options for the future of Forest City's chartered jet program.  (Tr. 239; *see also* Tr. 10.)  As part of their early discussions, Mr. Sonson indicated to Mr. Snyder that Century Jets was willing to "provide a plane to Forest City and position it at Burke [Lakefront] airport."  (Tr. 10-12.)  Under this proposed arrangement, Forest City would not have the exclusive use of Century Jets' plane based at Burke, but Forest City would have the right of first refusal.  (Tr. 12.)  At this time, Century Jets was "very interested" in establishing a base of operations at an airport in or around Cleveland, including Burke, if Forest City committed to use Century Jets for a substantial number of block hours of private chartered jet services.  (Tr. 258-60.)  Mr. Sonson credibly testified that establishing a base in the greater Cleveland area would be a significant cost-savings measure for Century Jets, because Century Jets was not compensated for repositioning aircraft into or out of Cleveland to meet Forest City's flight requests under the 2004 Agreement, *i.e.*, Forest City did not pay for "dead-head positioning" and only paid for flights in which it actually occupied the aircraft.  (Tr. 227, 258-60; *see also* Tr. 92-93, 200-01; Ex. 1.)  During these initial discussions in the summer of 2006, however, Mr. Snyder and Mr. Sonson did not reach any agreement on behalf of Forest City and Century Jets, let alone an agreement that Century Jets would be required to base a plane at Burke for Forest City's use.  (*See* Tr. 258-61; Exs. 2001 & 2002.)

-5-

### 5. September 1, 2006 Fax Regarding Forest City's Unused Flight Hours Under the Second Term of the 2004 Agreement

13. On September 1, 2006, after the initial meeting and discussions between Forest City and Century Jets, Mr. Sonson sent a fax to Mr. Snyder, informing him that Forest City had not flown 98.4 hours of the 150 block hours allocated under the second one-year term of the 2004 Agreement. (Tr. 237-38; Ex. 1001.)  Mr. Sonson enclosed the 2004 Agreement and wrote, "Per section 10 of the agreement, you [Forest City] must use the remaining 98.4 hours by October 2006 plus a 30 day extension **or** transfer the remaining hours to the next renewal term."  (Ex. 1001 (emphasis in original).)  Mr. Sonson sent the fax, because he wanted to make sure that Mr. Snyder and Forest City were aware that a number of hours had not yet been flown under the second term of the 2004 Agreement and that they were "going to lose the hours and the money associated with those hours unless something was done."  (Tr. 237-38.)

14. Mr. Sonson's fax to Mr. Snyder on September 1, 2006 led to discussions between Forest City and Century Jets regarding an extension of the 2004 Agreement and, ultimately, the negotiations leading to the execution of the 2006 Agreements.  (Tr. 237-39, 241-42; *see also* Tr. 15-17.)

### 6. September 21, 2006 Email Regarding Century Jets' Intention to Base a Plane At Burke

15. On September 21, 2006, as part of the negotiations of the proposed 2006 Agreements, Mr. Sonson sent an email to Mr. Snyder regarding, *inter alia*, Century Jets' intention, at that time, to base a plane at Burke for Forest City's use.  (Tr. 35-36, 314-316; Ex. 13.)  Mr. Sonson wrote in pertinent part, "The Beechjet 400A aircraft to be used in Cleveland will be acquired as we have discussed.  We have office and hangar space reserved at BKL [Burke] to set up our base of operations there."  (*Id.*)  At trial, however, Mr. Sonson credibly testified that acquiring a Beechjet aircraft and basing it at Burke was just one of the many options that he had discussed with Mr.

-6-

Snyder prior to entering into the 2006 Agreements.  (Tr. 315; *see also* Tr. 258-60.)  Further, Mr. Sonson's email of September 21, 2006 did not contain an unconditional promise that Century Jets would maintain or base a plane at Burke for Forest City's use.  (*See* Ex. 13.)

### 7.    September 22, 2006 Meeting in Nashua, New Hampshire

16.    The next day, September 22, 2006, negotiations between Forest City and Century Jets continued during a meeting at Century Jets' office at the airport in Nashua, New Hampshire.  (Tr. 158, 189-192, 194-96, 198-99, 213-15, 241-45, 251-52, 254-55, 260-61, 324, 346-48, 350-51, 356; *see also* Ex. 13.)  The participants at the meeting were as follows:  Brad Snyder and Chuck Snyder on behalf of Forest City and Chuck Sonson and Regina Kelly on behalf of Century Jets.  (Tr. 158, 189, 242.)  Chuck Snyder, who is no relation to Brad Snyder, is a pilot who used to fly for Forest City.  He consulted with Brad Snyder in the review of Forest City's chartered-jet program in 2006. (Tr. 157-59.)[3]  Regina Kelly, who is Mr. Sonson's sister, serves as the operations manager for Century Jets and its affiliated companies.  (Tr. 188.)  Ms. Kelly also is the controller for one of the affiliated companies – 24th Century, Inc.  (*Id.*)

17.    During the September 22, 2006 meeting in Nashua, four important items regarding the 2004 Agreement and the proposed 2006 Agreements were discussed.

18.    First, according to the credible testimony of Mr. Sonson and Ms. Kelly, Mr. Snyder expressed concern that Forest City would be forced to forfeit the nearly 100 hours yet to be flown under the second term of the 2004 Agreement, because that could cause a forfeiture of approximately $315,000 of escrowed funds.  (Tr. 189-92, 241-45.)  Mr. Sonson replied during the meeting by stating that, if Forest City would enter into the proposed 2006 Agreements "unconditionally for five

---

[3]  To clarify, all previous and future references in this Opinion and Order to "Mr. Snyder" refer to Brad Snyder, not Chuck Snyder.

years," Century Jets would agree to defer the commencement date of the new contract until Forest City flew the remaining hours under the 2004 Agreement, thereby avoiding any forfeiture.  (*Id.*)  Mr. Snyder then inquired as to what Forest City's liability and exposure would be under the 2006 Agreements as then proposed, and Mr. Sonson indicated that Forest City would be obligated for the full amount of the payments due – approximately $5 million.  (Tr. 192, 199, 244-45.)  As a result of these discussions, and as outlined in more detail below, Forest City and Century Jets eventually agreed that the 2006 Agreements, unlike the 2004 Agreement, could not be terminated unilaterally by Forest City.  (Tr. 245; *compare* Exs. 2001 & 2002 at ¶ 2 *with* Ex. 1 at ¶ 2.)  Further, in light of the aforementioned discussions, and again as outlined in more detail below, after Forest City and Century Jets subsequently executed the 2006 Agreements on October 1, 2006, the parties orally agreed to delay commencement of the 2006 Agreements until Forest City flew its remaining hours under the second term of the 2004 Agreement.  (Tr. 15-18, 352.)

19.  Second, according to the credible testimony of Mr. Sonson and Ms. Kelly, Mr. Snyder sought to negotiate more favorable block hour rates during the Nashua meeting, and these discussions led to the bifurcated rates for one-way and round trip flights eventually agreed upon in the 2006 Agreements, as opposed to the single block hour rate contained in the 2004 Agreement. (Tr. 192-93, 251-54; *compare* Exs. 2001 & 2002 at ¶ 3 *with* Ex. 1 at ¶ 3; *see also* Tr. 84-85.) Specifically, Mr. Sonson credibly testified in pertinent part that Century Jets could charge Forest City a lower block hour rate for round-trip flights, *i.e.*, flights where there was no "dead-head positioning" costs:

> Q.    Now, in your negotiations for the 2006 agreements, was there an effort by Mr. Snyder to negotiate the rate?
>
> A.    Absolutely.

-8-

Q.    And tell us what transpired in that regard?

A.    Well, when we were in Nashua, New Hampshire, at this what I would call a pre-contract meeting, Mr. Snyder asked if I could do anything with the rate. At that time we were talking about a single rate. Could we do anything with that rate, let's say for the Beechjet because we were operating under the jet card rate or the one-way rate of $2650.  That rate was pretty low in the industry.  It was a very good deal for them and I told him, you know, I can't do anything with this rate but there are some instances that I have seen in your flying history that you guys just don't go let's say from Cleveland to New York and drop the plane. You go from Cleveland to New York back to Cleveland the same day.  On those flights, and it is perfectly spelled out in the contract, the rules governing what those flights are or where they have to take off from and I can give you a break because the block-hour or jet card rate, there is part of that is allocated to a little position. So that precipitated or evolved into the two rates.

(Tr. 251-52.)  The introduction of the respective bifurcated rates in the proposed 2006 Agreements, however, created a drafting problem that was not an issue during the drafting of the 2004 Agreement. (Tr. 192-93, 251-54.)  Specifically, it was unclear what rate should be used to determine Forest City's pre-payments under the proposed agreements.  (*Id.*)  In response, the participants at the Nashua meeting discussed incorporating a reconciliation clause whereby, at the end of each one-year term,  the precise amounts due Forest City or Century Jets could be calculated in light of the number and type of flights Forest City had actually flown, *i.e.*, round-trip or one-way. (*Id.*)  As Mr. Sonson credibly testified, the bifurcated rates required that a reconciliation clause be incorporated into the proposed 2006 Agreements, and this was explicitly discussed at the Nashua meeting:

Q.    How did the fact that you now had two rates affect the drafting?

A.    That produced kind of a dilemma because the contract rates have to be based on something. Obviously if the round trip rate was never used, all the payments would be under the jet card or the one-way rate or the block-hour rate.  So it was decided that we would base the payments on the hour [higher] amount, the jet card rate, and we would do a reconciliation at the end of the contract and there were two instances where this would come to pass[.]  [I]f any hours that weren't used that were the block-hour rate there would be a discrepancy. Conversely if the last flight of the contract, we will say for

-9-

example there were two hours left and in the air, you know, that we went over the hours and we flew ten hours instead of two hours there would be a discrepancy on the other side. So the reconciliation clause and this was fully discussed at this pre-contract meeting, the reconciliation clause was put in there as an accounting adjustment for that problem and that problem only.

(Tr. 253-54.)

20. Third, Mr. Sonson credibly testified that he expressly informed Mr. Snyder during the Nashua meeting that he refused to incorporate a provision in the proposed 2006 Agreements that would require Century Jets to base a plane at Burke for Forest City's use. (Tr. 260-61, 324, 338; *see also* Tr. 52-53, 78-81.)[4] Mr. Sonson's credible testimony negates Mr. Snyder's and Forest City's contention that Century Jets agreed to base a plane at Burke in exchange for Forest City's agreeing that it would not have the right to unilaterally terminate the 2006 Agreements. (*See* Tr. 29-32, Doc. 45 at 15.) Because Mr. Sonson was adamant that Century Jets would not agree to a provision that it be required to maintain or base a plane at Burke for Forest City's use (and, ultimately, as discussed

---

[4] Mr. Sonson testified in part:

Q.    Now there was testimony by Mr. Snyder that he was aware when Forest City signed these agreements that you refused to put in a provision in the contract relating to basing an aircraft at Burke. Are you aware of that testimony?

A.    Yes.

. . .

Q.    Is that a fact? Did you so refuse?

A.    Yes. You know, in our meeting at Nashua, New Hampshire, that was one of the topics and I expressly told him that I would not commit to that; that there was no way we could commit to that. You know, I think maybe he got confused with our business plan but it was definitive that we were not going to put that in the contract.

(Tr. 260-61.)

-10-

in more detail below, there is no such provision in the executed 2006 Agreements), Mr. Snyder's testimony regarding the rationale for the removal of the unilateral termination clause in the proposed 2006 Agreements is not persuasive. Instead, as noted, Forest City and Century Jets eventually agreed that the 2006 Agreements could not be terminated unilaterally by Forest City, in return for Century Jets' agreement to allow Forest City to fly (and not forfeit) its remaining hours under the 2004 Agreement. (Tr. 241-45.)[5]

21. And fourth, according to the credible testimony of Mr. Sonson and Ms. Kelly, Mr. Snyder requested during the Nashua meeting that a provision be incorporated in the proposed 2006 Agreements that would grant Forest City and its executives access to an office facility at Burke when flying into or out of the airport. (Tr. 194-96, 254-55, 346-48.) Ms. Kelly replied to Mr. Snyder by indicating that Century Jets and its customers had access to a conference room owned by a Fixed-Base Operation ("FBO") called Million Air. (*Id.*)[6] Ms. Kelly then described Million Air's

_____

[5] Mr. Sonson testified in part:

Q. Under the earlier agreement, we talked about the charterer's [Forest City's] right to cancel under – basically on an annual basis. Do you recall that testimony?

A. I do.

Q. Was that provision carried through to the new agreements?

A. No, because of the same basic function. We were talking about, you know, extending the other contract. We wanted to receive some kind of compensation for that, and in an option contract or a one-year ad hoc contract, it would not have been sufficient for that.

(Tr. 245.)

[6] An FBO is a private company that provides various aviation-related services at airports, such as refueling, aircraft maintenance, tie-down parking, hangar services, and waiting room facilities. (*See* Tr. 123.)

-11-

conference room to Mr. Snyder, and Mr. Snyder responded to her by stating that he was familiar with the room and that it was fine.  (Tr. 194-96, 254-55, 346-48.)  In this regard, Mr. Snyder admitted at trial that, prior to entering the 2006 Agreements on October 1, 2006, he knew that Century Jets did not have its own office facility at Burke, lending credence to Mr. Sonson's and Ms. Kelly's testimony that the office facility contemplated during the negotiations of the proposed 2006 Agreements was the conference room owned by Million Air, not an office facility owned or leased by Century Jets.  (Tr. 100-01.)

> **8.**     **Negotiations Continued After the Nashua Meeting and Drafts of the Proposed 2006 Agreements Were Exchanged Until October 1, 2006**

22.  After the September 22, 2006 meeting in Nashua, Forest City and Century Jets began exchanging drafts of the proposed 2006 Agreements.  (*See* Tr. 83, 240, 242, 249-50, 308, Ex. 15.) Mr. Sonson created the initial draft of the proposed 2006 Agreements, which he generally patterned after the 2004 Agreement.  (Tr. 13, 68, 224-25, 242, 308-09.)  While Century Jets did not utilize legal counsel in connection with either the 2004 Agreement or the 2006 Agreements, Forest City had legal counsel involved in the negotiation and drafting of both the 2004 Agreement and the 2006 Agreements.  (Tr. 14, 83, 224-25, 242, 308-09, 369-70.)

23. On September 25, 2006, as negotiations between Forest City and Century Jets continued, Mr. Snyder sent an email to Mr. Sonson that included several comments concerning the current drafts of the proposed 2006 Agreements.  (Ex. 15; *see also* Tr. 36-38, 83-84, 320-22.)  Mr. Snyder wrote in pertinent part:

I have reviewed the contract and have the following comments:

Need to add:

* Charterer [Forest City] has approval authority for plane and pilots.  Plane contemplated is '95 or later.

-12-

> \*      Office at Burke available to executives
>
> \*      Fees (landing, etc.) we discussed in NH
>
> \*      Remove 2 hour minimum provision
>
> \*      Can we be more specific on wire transfer timing – indicates 'upon receipt' however we need time to review and arrange for wire.
>
> \*      Does the agreement discuss the situation where you need to substitute a plane.  You normally don't charge us for difference [*sic*] plane in those instances.
>
> \*      Is there a cancellation fee related to the aircraft parked at Burke? – Attachment 5

Please call to discuss the number of hours to guarantee in the agreement.

(Ex. 15.)

24.  On September 26, 2006, Mr. Sonson sent a reply email to Mr. Snyder, addressing Mr. Snyder's comments.  (Tr. 36-38, 320-22, Ex. 15; *see also* Tr. 83-84.)  Mr. Sonson wrote in pertinent part:

> Please find enclosed the revised contracts for the Beechjet 400A and Hawker 800 (changes in red).  The contracts diverged a little due to the guarantee of the based Beechjet vs the Hawker.  We also intend to base the Hawker at BKL [Burke], but due to the lower utilization commitment, the Hawker didn't come with the same specific guarantees of the Beechjet 400A.  Also, I complied with as many of your requests as I could.  Some, such as approval authority, bucked up against the Federal Regulations governing operational control and non-regulated entities (you).  Aircraft substitution is covered in paragraph 7.  The cancellation fee would also apply to the primary aircraft at BKL [Burke], because the aircraft might not be at BKL [Burke] when scheduled.  Example – Albert [Ratner of Forest City] flies to PIT on Beechjet.  Mary [Abraham of Forest City] schedules a trip following day [*sic*] on Beechjet.  Aircraft moves, Mary's pax cancel.
>
> . . .
>
> I will call you tomorrow to discuss the changes to the contracts.

-13-

(Ex. 15.)[7]  While Mr. Snyder testified that he believed "the guarantee" Mr. Sonson was referring to in the email was "providing a plane for Forest City and basing that plane at Burke" (tr. 38), Mr. Sonson's email of September 26, 2006 did not contain an unconditional promise that Century Jets would maintain or base a plane at Burke for Forest City's use (ex. 15).[8]  Further, as noted, Mr. Sonson's credible testimony at trial reveals that it merely was his goal and business plan to establish a base of operations in the greater Cleveland area and that he expressly refused to incorporate a provision in the proposed 2006 Agreements that would require Century Jets to maintain or base a plane at Burke for Forest City's use.  (Tr. 258-61, 324, 338-39; see also Tr. 52-53, 78-81.)

## D.     THE 2006 AGREEMENTS EXECUTED ON OCTOBER 1, 2006

25.  On October 1, 2006, at the conclusion of the negotiations between the parties, Forest City and Century Jets executed the Beechjet and Hawker Agreements, i.e., the 2006 Agreements, whereby Century Jets agreed to provide Forest City, and Forest City agreed to pay for, hundreds of block hours of private chartered jet services at fixed hourly rates.  (Tr. 14-15, 38, 310, Exs. 2001 & 2002.)  More specifically, for five one-year terms, the parties contracted for 300 block hours of jet services per year under the Beechjet Agreement, and 100 block hours of jet services per year under the

---

[7]  No draft or revised contracts were included in the trial record.  (See Tr. 84, 341.)

[8]  It is true, moreover, that Mr. Snyder's September 25, 2006 email did not ask for any such guarantee; the only "guarantee" mentioned related to Forest City's obligation to guarantee a set number of hours of use – a guarantee which differed or "diverged" in the two arguments, as per the Sonson email.  Hence, the Court finds that the guarantee referenced in the September 26, 2006 email did not speak to an obligation on the part of Century Jets to base an aircraft at Burke.

Hawker Agreement.  (Ex. 2001 at ¶¶ 2-3, Ex. 2002 at ¶¶ 2-3.)[9]

26.  In general, while there are significant differences between the Beechjet and Hawker Agreements, the terms of the two agreements, which are set forth in more detail below, are similar to one another.  (*Compare* Ex. 2001 *with* Ex. 2002.)  The terms of the 2006 Agreements also are similar to the terms of the 2004 Agreement, except for the absence of a unilateral right to termination in the former.  (*Compare* Exs. 2001 & 2002 *with* Ex. 1.)

### 1.    Primary Aircraft Designations

27.  The Beechjet and Hawker Agreements both initially provide that Century Jets agrees to make a primary aircraft "available for the non-exclusive use of [Forest City], upon the terms and conditions more particularly set forth" in each of the two respective agreements.  (Exs. 2001 & 2002 at ¶ 1.)

28.  Under the Beechjet Agreement, the designated primary aircraft is listed as a "Beechjet 400A (TBD)."  (Ex. 2001 at Attachment 1.)  It is undisputed by the parties that "TBD" means "to be determined" and that, at the time of entering into the contract on October 1, 2006, a primary aircraft had not yet been designated.  (Tr. 110-11, 263-64, 275.)  Pursuant to paragraph 3(c) of the Beechjet Agreement, Forest City had the right to approve Century Jets' "choice for Primary Aircraft listed in Attachment 1, and [Century Jets'] primary assigned aircrew for this Aircraft, to the extent permitted by the Federal Aviation Regulations."  (Ex. 2001 at ¶ 3(c).)

_____

[9]  According to Mr. Snyder, the general difference between a Beechjet aircraft and a Hawker aircraft is as follows:

> The Beechjet is a light jet carrying – has the ability to carry six or seven passengers, and a Hawker is a mid-size jet able to carry more passengers and able to travel greater distances than the light jet.

(Tr. 15.)

29.  By contrast, under the Hawker Agreement, a primary aircraft was designated at the time the parties entered into the contract.  (Tr. 111; Ex. 2002 at Attachment 1.)  The designated primary aircraft under the Hawker Agreement is listed as a "Hawker 800A (N295JR)."  (Ex. 2002 at Attachment 1.)

### 2.    Five Successive One-Year Terms

30.  The Beechjet and Hawker Agreements then provide that the terms of the respective agreements shall commence on October 1, 2006 and shall continue for five successive one-year terms:

> The Term of this Agreement shall commence on the date set forth above [October 1, 2006] and shall continue for a period of one (1) year, or [until Forest City's] consumption of all Allocated Hours [*i.e.*, 300 block hours under the Beechjet Agreement and 100 block hours under the Hawker Agreement], whichever shall first occur, AND THEREAFTER for four (4) successive, additional one (1) year terms (each a "Renewal Term") for an additional [300 block hours under the Beechjet Agreement and 100 block hours under the Hawker Agreement] per Renewal Term under these same terms and conditions, however, the Contract Rate under 3(a) will be adjusted by the Consumer Price Index . . . for each Renewal Term.

(Exs. 2001 & 2002 at ¶ 2.)

### 3.    Termination By Mutual Consent

31.  As noted, unlike the 2004 Agreement, which could be terminated unilaterally by Forest City at the end of each one-year term, the Beechjet and Hawker Agreements both provide that they may be terminated prior to their expiration "with the mutual consent of the parties."  (*Compare* Ex. 1 at ¶ 2 *with* Exs. 2001 & 2002 at ¶ 2.)

### 4.    Usage, Contract Rate, and Payment Provisions

32.  Paragraphs 3 and 4 of the Beechjet and Hawker Agreements both set forth the usage, contract rate, and payment terms.  (Exs. 2001 & 2002 at ¶¶ 3-4.)

-16-

33.  Under the Beechjet Agreement, paragraph 3 provides that Century Jets agreed to furnish Forest City, and Forest City agreed to pay for, a "guaranteed block of 300 hours" of private chartered jet services per one-year term at the contract rate of $2,650/hour for one-way flights and $2,200/hour for round-trip flights:

> (a) [Forest City] agrees to pay for and [Century Jets] agrees to furnish to [Forest City] a guaranteed block of 300 hours of Aircraft flight time (the "Allocated Hours") during the Term and each Renewal Term of this Agreement and [Forest City] agrees to pay to [Century Jets] the amount of $2650.00/hour for each hour utilized under the JetCard [one-way] rate and $2200.00/hour for each hour utilized under the Round Trip Charter Rate, (the "Contract Rate") for said block of Allocated Hours, in accordance with the provisions of Section 4, below. . . .

(Ex. 2001 at ¶ 3.)  Paragraph 4 of the Beechjet Agreement then provides that Forest City pre-pay for the flights by making three yearly deposits to a third-party escrow account based upon the one-way flight rate, *i.e.*, three deposits in the amount of $265,000 ([$2,650 x 300 hours] / 3):

> Upon execution of this Agreement [Forest City] shall deposit Two Hundred Sixty Five Thousand Dollars ($265,000.00) to the escrow account described below to be used to pay the contract rate and amounts due [Century Jets] under paragraph 3(a) above, and [Forest City] . . . shall make additional Two Hundred Sixty Five Thousand Dollars ($265,000.00) deposits to the escrow account on the fourth and eighth month anniversaries of the execution date.  Payments during any Renewal Term shall be made in the same manner as the preceding sentence. . . .

(*Id.* at ¶ 4.)

34.  Under the Hawker Agreement, paragraph 3 provides that Century Jets agreed to furnish Forest City, and Forest City agreed to pay for, a "guaranteed block of 100 hours" of private chartered jet services per one-year term at the contract rate of $3,250/hour for one-way flights and $2800/hour for round-trip flights:

> (a) [Forest City] agrees to pay for and [Century Jets] agrees to furnish to [Forest City] a guaranteed block of 100 hours of Aircraft flight time (the "Allocated Hours") during the Term and each Renewal Term of this Agreement and [Forest City] agrees to pay to [Century Jets] the amount of $3250.00/hour for each hour utilized under the JetCard [one-way] rate and $2800.00/hour for each hour utilized under the Round

-17-

Trip Charter Rate, (the "Contract Rate") for said block of Allocated Hours, in accordance with the provisions of Section 4, below. . . .

(Ex. 2002 at ¶ 3.)  Paragraph 4 of the Hawker Agreement then provides that Forest City pre-pay for the flights by making three yearly deposits to a third-party escrow account based upon the one-way flight rate, *i.e.*, three deposits in the amount of $109,000 ([$3,250 x 100 hours] / 3):

Upon execution of this Agreement [Forest City] shall deposit One Hundred Nine Thousand Dollars ($109,000.00) to the escrow account described below to be used to pay the contract rate and amounts due [Century Jets] under paragraph 3(a) above, and [Forest City] . . . shall make additional One Hundred Nine Thousand Dollars ($109,000.00) deposits to the escrow account on the fourth and eighth month anniversaries of the execution date.  Payments during any Renewal Term shall be made in the same manner as the preceding sentence. . . .

(*Id.* at ¶ 4.)[10]

35.  In addition to the base hourly rates for the block hours of jet services contracted for under the Beechjet and Hawker Agreements, Forest City agreed to pay Century Jets "for all other Aircraft-related costs as set forth in Attachment 2."  (Exs. 2001 & 2002 at ¶ 4(d).)  Some of the separate aircraft-related costs set forth in Attachment 2 of the 2006 Agreements are as follows:  use of a flight phone, landing/parking fees, de-icing fees, catering, use of a flight attendant, crew overnight expenses, fuel surcharges, and excise taxes.  (*Id.* at Attachment 2.)

36.  Further, under the Beechjet and Hawker Agreements, Forest City agreed "to be governed by the cancellation policy as set forth in Attachment 5."  (*Id.* at Attachment 5.)  Attachment 5 of the 2006 Agreements provides:

If [Forest City] cancels a charter trip after receiving a confirmation from [Century Jets]:

*        [Forest City] shall be assessed no penalty if such cancellation notification is

_____

[10]  [$3,250 x 100 hours] / 3 actually equals $108,333.33.  The parties rounded up to $109,000.

received by [Century Jets] more than 24 hours prior to scheduled departure time/date.

* [Forest City] will be debited two (2) Flight Hours for the charter trip if cancellation notification is received less than 24 hours prior to scheduled departure time/date.

* [Forest City] will be debited 100% of the total estimated Flight Hours for the charter trip if cancellation notification is received after the aircraft to be used on the trip departs to operate the trip.

* [Forest City] agrees to pay all additional aircraft related costs set forth in Attachment 2, incurred on any charter trips cancelled by [Forest City] with less than 24 hours advance notice.

(*Id.*)

37.  Under the Beechjet and Hawker Agreements, Forest City's pre-payments to the third-party escrow account are then debited to Century Jets after each charter flight or cancelled charter trip.  (*Id.* at ¶ 4(b).)

38.  Both the Beechjet and Hawker Agreements provide for a reconciliation of the third-party escrow account at the end of each one-year term:

At the conclusion of the Term and each Renewal Term a reconciliation of the escrow account will be conducted within 10 calendar days.  Subsequently, any amounts due [Century Jets] shall be paid by [Forest City] within 15 calendar days and/or any excess amounts contained in the escrow account due [Forest City] shall be refunded to [Forest City] within 15 calendar days.

(*Id.* at ¶ 4(a).)

39.  Like the 2004 Agreement, the terms and conditions regarding the third-party escrow account identified in the 2006 Agreements are governed by the Escrow Agreement executed by Forest City, Century Jets, and National City Bank of the Midwest on November 15, 2004.  (Ex. 2; *see also* Exs. 2001 & 2002 at ¶ 4(b).)

-19-

### 5.    Non-Exclusive Use and Use of Substitute Aircraft

40.  The Beechjet and Hawker Agreements both provide that the primary aircraft "hired hereunder [*i.e.*, the Beechjet 400A(TBD) and the Hawker 800A(N295JR)] and the flying services to be furnished in connection herewith are to be furnished to [Forest City] on a non-exclusive basis." (Exs. 2001 & 2002 at ¶ 7.)

41.  Further, the Beechjet and Hawker Agreements both provide that Century Jets shall be permitted to use a substitute aircraft rather than the primary aircraft identified in the contract:

> If the [primary] Aircraft is unavailable for any reason, [Century Jets] reserves the right to substitute an aircraft comparable to or of a higher class than the [primary] Aircraft (which for purposes of that flight(s) will be deemed the Aircraft). Attachment 3 lists "comparable" aircraft which can be used. [Century Jets] represents and warrants that it currently has and for the Term of this Agreement shall maintain sufficient and suitable aircraft under contract which shall be available to permit [Century Jets] to fulfill its obligations hereunder.

(*Id.*)

42.  Relatedly, the Beechjet and Hawker Agreements also both provide that there "shall be no limit to the number of aircraft that [Forest City] may charter simultaneously."  (*Id.* at ¶ 1.)

### 6.    Twenty-Four Hour Notice Required for Guaranteed Availability

43.  The Beechjet and Hawker Agreements both provide that "twenty-four (24) hour minimum advance notice is required for guaranteed availability of [the] primary Aircraft or substitute."  (*Id.* at Attachment 1.)

### 7.    Utilization of an Interchange Aircraft

44.  The Beechjet and Hawker Agreements both provide that Forest City may request and fly an "interchange aircraft," or an aircraft different than the primary aircraft identified in the contracts:

> Interchange.  While it is the present intention of [Forest City] to purchase a block of time to be utilized on the [primary] Aircraft, [Forest City] may, from time to time, need or want to utilize a different aircraft (the "Interchange Aircraft").  [Forest City]

-20-

may, upon notice to [Century Jets] and subject to aircraft availability, apply its Allocated Hours to charter the Interchange Aircraft for the Aircraft. [Century Jets] shall utilize its best efforts to make the specifically requested Interchange Aircraft available upon [Forest City's] request, but shall suffer no penalty for its inability to do so.

(*Id.* at ¶ 8.)

45. The Beechjet and Hawker Agreements then both provide that an additional charge for use of an interchange aircraft may be applicable in certain situations:

Charge for Use of Interchange Aircraft. No additional charge shall be made for the use of an Interchange Aircraft, unless an Interchange Aircraft of a different make or model than the [primary] Aircraft is used. In such an event, the charge for the Interchange Aircraft shall be based upon the Interchange Ratios set forth Attachment 4 hereof (which itself is subject to change from time to time upon prior notice to [Forest City], and shall be debited or credited against the balance of [Forest City's] unused Allocated Hours.

(*Id.* at ¶ 9.)

46. Attachment 4 of the Beechjet Agreement provides the following interchange ratios:

Challenger 601 – 1.70:1

Falcon 50 – 1.65:1

Falcon 900 – 2.21:1

Gulfstream IV – 2.21:1

Gulfstream III – 1.70:1

(Ex. 2001 at Attachment 4.)

47. Attachment 4 of the Hawker Agreement provides the following interchange ratios:

Challenger 601 – 1.41:1

Falcon 50 – 1.35:1

Gulfstream III – 1.41:1

Falcon 900 – 1.85:1

Gulfstream IV – 1.85:1

(Ex. 2002 at Attachment 4.)

### 8.    Unused Flight Hours

48.  Like the 2004 Agreement, the Beechjet and Hawker Agreements both provide that Forest City would forfeit the block hours of private chartered jet services that it did not utilize in a specified term unless carried over to the Renewal Term:

> In the event there are any unused Allocated Hours remaining in [Forest City's] account at the end of the term or any Renewal Term, [Forest City] shall be given an automatic 30 day extension period within which to use the Allocated Hours. Thereafter any remaining unused Allocated Hours shall be forfeited unless the Agreement is renewed whereupon the unused hours shall be transferred to the Renewal Term.

(Exs. 2001 & 2002 at ¶ 10.)

### 9.    Terms of Default and Remedies

49.  Paragraphs 13 and 14 of the Beechjet and Hawker Agreements both define an "event of default" and set forth the remedies to which the non-defaulting party was entitled.  (*Id.* at ¶¶ 13-14.)

50.  Specifically, paragraph 13 of the Beechjet and Hawker Agreements defines an "event of default" in pertinent part:

> The (a) failure of either party to perform or observe (or cause to be performed or observed) any covenant or agreement to be performed or observed by it under this Agreement, or (b) if any representation or warranty made by either party or any document or certificate furnished by a party pursuant hereto shall prove to have been incorrect in any material respect at the time made and shall remain incorrect at the time in question . . . shall be deemed an event of default.

(*Id.* at ¶ 13.)

51.  Paragraph 14 of the Beechjet and Hawker Agreements then provides that the following remedies are available to a party upon the other party's default:

-22-

Upon the event of any default and at any time thereafter, so long as such event of default shall not have been cured or remedied within thirty (30) days, the non-defaulting party may, at its option, declare the defaulting party to be in default and, at any time thereafter so long as such event of default shall be continuing, may take any action at law or in as the non-defaulting party in its sole discretion shall elect, to the extent permitted by, and subject to compliance with any mandatory requirements of, applicable law then in effect including, but not limited to, filing suit for specific performance and/or terminating this Agreement and canceling the continuing obligations of the non-defaulting party.  In addition, in the event of a default by [Century Jets], [Forest City] shall have the right to demand and receive funds remaining on deposit in the escrow account.

(*Id.* at ¶ 14.)

### 10. Virginia Law Governs

52.  Paragraph 15(b) of the Beechjet and Hawker Agreements provides that the respective agreements "shall be interpreted and governed by the laws of the State of Virginia."  (*Id.* at ¶ 15(b).)

### 11. Entire Agreement

53.  Paragraph 15(d) of the Beechjet and Hawker Agreements provides as follows:

This Agreement and Attachments 1 through 5 constitute the entire understanding between the parties and there are no representations, warranties, conditions, covenants or agreements other than as set forth expressly herein.

(*Id.* at ¶ 15(d).)

### 12. Waiver

54.  Paragraph 15(g) of the Beechjet and Hawker Agreements sets forth the following waiver provision:

The failure of either party to insist on strict performance of any of the agreements, terms, representations, warranties, covenants and conditions hereof shall not be deemed a waiver of any rights or remedies that a party may have for any subsequent breach, default, or non-performance by the other party, and the waiving party's right to insist on strict performance of this Agreement shall not be affected by any previous waiver or course of dealing.

(*Id.* at ¶ 15(g).)

### 13.    Access to Office Facility at Burke Under the Beechjet Agreement

55.  Under the Beechjet Agreement, the parties agreed to the following provision regarding access to an office facility:  "[Century Jets] will grant [Forest City] full access to its office facility (phone/fax/internet/meetings) at Cleveland Burke Lake [*sic*] Airport (BKL)."  (Ex. 2001 at ¶ 3(c).)

56.  There is no corresponding provision related to an office facility in the Hawker Agreement.  (*See generally* Ex. 2002.)

### 14.    No Provision Requiring Century Jets to Maintain or Base a Plane at Burke for Forest City's Use

57.  As noted, there is no provision in either the Beechjet or Hawker Agreement requiring Century Jets to maintain or base a plane at Burke for Forest City's use.  (*See generally* Exs. 2001 & 2002; *see also* Tr. 52; Doc. 45 at 15; Tr. 382 ("[T]he Beechjet Agreement does not say that a Beechjet will be placed at Burke.").

### E.    THE COMMENCEMENT DATE OF THE 2006 AGREEMENTS WAS SUBSEQUENTLY MODIFIED BY AN ORAL AGREEMENT

58.  Also as noted earlier, after executing the Beechjet and Hawker Agreements on October 1, 2006, Forest City and Century Jets orally agreed to delay the commencement of the 2006 Agreements until Forest City flew its remaining hours under the second term of the 2004 Agreement. (Tr. 15-18, 47-49, 352; Ex. 26; *see also* Tr. 243-44, 249.)

59.  Forest City then flew its remaining hours under the 2004 Agreement during the next two months, *i.e.*, from October 1, 2006 through November 30, 2006.  (*Id.*)

60.  Consequently, the Beechjet and Hawker Agreements commenced on November 30, 2006.  (*Id.*)

F.      **THE PARTIES' PERFORMANCE UNDER THE 2006 AGREEMENTS**

      1.      **Century Jets Performed All Requested Flights Without Incident or Complaint**

61. On or about November 30, 2006, Forest City made its first pre-payments under the 2006 Agreements, *i.e.*, made deposits to the third-party escrow account of $265,000 pursuant to the Beechjet Agreement and $109,000 pursuant to the Hawker Agreement. (Tr. 250; *see also* Exs. 2001 & 2002 ¶ 4.)

62. Forest City thereafter began flying hours under the Beechjet and Hawker Agreements. (Tr. 173-75, 334-36, 366-68; Exs. 26, 1018.)

63. During this time, and continuing until the termination of the 2006 Agreements, Forest City never sought or requested access to the "office facility" referred to in the Beechjet Agreement. (Tr. 103-04, 186-87.)

64. Further, Forest City never complained about Century Jets' performance with respect to any particular flight under the 2006 Agreements. (Tr. 96, 174-75; *see also* Tr. 245-48, 250.)[11]  In particular, Mary Abraham, Forest City's Jet Program Administrator, testified that she was satisfied with Century Jets' overall performance. (Tr. 166-68, 174-75.) Similarly, Mr. Snyder could not recall any instance in which Century Jets failed to provide chartered jet services when given the required twenty-four hour notice. (Tr. 96.) And finally, Mr. Snyder confirmed that there was no dispute between Forest City and Century Jets with respect to the performance of any requested flight.

---

[11]  There was one instance under either the 2004 or 2006 Agreements in which Century Jets initially could not provide chartered jet services to Forest City on less than twenty-four hours notice, but subsequently was able to perform the flight and arrived at the airport even though Forest City already had hired another company to fulfill the request. (Tr. 245-48; *see also* Tr. 175-76, 179-81.) Because of the confusion, Century Jets agreed to grant Forest City additional hours under the relevant agreement. (*Id.*)

(Tr. 96.)

## 2.    Century Jets' Interest in Basing a Plane at Burke for Forest City

65.  Despite Mr. Sonson's explicit refusal to incorporate a provision in the 2006 Agreements requiring Century Jets to maintain or base a plane at Burke for Forest City's use, Mr. Sonson was still interested in acquiring a Beechjet aircraft and basing it at Burke to service Forest City, and he communicated that interest to Mr. Snyder and Ms. Abraham in several emails after the 2006 Agreements were executed.  (*See* Tr. 258-61, 322-25, 329-39, 366-68; Exs. 21-27; *see also* Tr. 38-53, 78-81.)  As noted, however, Mr. Sonson's credible testimony at trial reveals that it merely was his intent and business plan to attempt to establish a base in the greater Cleveland area.  (Tr. 258-61, 322-25, 329-39.)  Further, none of the emails between Mr. Sonson and Mr. Snyder or Ms. Abraham after the 2006 Agreements were executed, *i.e.*, from January 19, 2007 through March 1, 2007, contained an unconditional promise that Century Jets would maintain or base a plane at Burke for

Forest City's use.  (*See* Exs. 21-27.)[12]

### 3.    Forest City's Notice of Default to Century Jets

66.  On March 2, 2007, and again on March 5, 2007, Mr. Snyder telephoned Mr. Sonson and informed him that Forest City believed Century Jets was in default of the 2006 Agreements.  (Tr. 53-57, 148-50; *see also* Ex. 28.)  Specifically, Mr. Snyder stated that Century Jets was in default, because it had failed to maintain or base a plane at Burke for Forest City's use and had failed to maintain an office facility at Burke for Forest City's use.  (*Id.*)

67.  On March 8, 2007, Mr. Sonson memorialized his conversations with Mr. Snyder in an email, identifying Mr. Snyder's and Forest City's demands, *i.e.*, the nature of Century Jets' default. (Ex. 28; *see also* Tr. 256-58, 268-75.)  Mr. Sonson wrote in pertinent part:

---

[12]  For example, Forest City relies in part on an email dated February 26, 2007 from Mr. Sonson to Ms. Abraham to assert that Century Jets promised to base a plane at Burke.  (Ex. 26.) In the email, Mr. Sonson first updated Ms. Abraham on the number of hours Forest City had flown under the Beechjet and Hawker Agreements, because Forest City had not flown any hours for over a month.  (Tr. 366-68; Exs. 26, 1018; *see also* Tr. 334-36.)  Mr. Sonson then wrote in pertinent part:

> The new hours contracts were put into place after the old hours were all used up from the previous contracts and the date was 11/30/06.  So that means you will have until 11/30/07 to use this year's allocation which if you do the math breaks down into approx 34 hours per month from now.  We are very close to putting that Beechjet at Burke and I won't have the flexibility to extend the hours like last time if I have all that overhead sitting at Burke.  I want to keep you up on this so we don't get backed into a corner later this year.

(Ex. 26.)  Instead of supporting Forest City's contention in this case, however, Mr. Sonson's email of February 26, 2007 actually supports Century Jets' position.  The email reveals that Mr. Sonson was communicating his business plan to Ms. Abraham and Forest City, *i.e.*, Century Jets' plan to acquire a Beechjet and base it at Burke for Forest City's use, and he merely was informing them that "if" (not "when") Century Jets did place a Beechjet at Burke, he would not have the flexibility to extend the hours under the 2006 Agreements.  (*See id.*; *see also* Tr. 258-61, 324, 338-39.)  It also confirms that both parties were aware as of the execution of the 2006 Agreement that no aircraft was then based at Burke.

In reference to our conversation of Monday, March 5, 2007, you [*i.e.*, Mr. Snyder] made several demands in regard to two Block Hour Agreements signed between Forest City Enterprises Inc. and Century Jets, LLC dated October 1, 2006.  You stated that if we did not meet these demands within 30 days you did not wish to continue with the contracts.  You also stated that you did not believe that Century Jets, LLC could comply with your demands within the 30 day period.

These demands as I understand them are as follows:

1) That Century Jets, LLC purchase a Beechjet 400A aircraft, base that aircraft at Cleveland (BKL), and have the aircraft and crews completely certified within 30 days.  The aircraft would have to be purchased, and no other form of possession or operation of the aircraft would be acceptable.  You also made the statement that you had called the FBO at Cleveland and verified that there was no hangar space available.

2) That Century Jets, LLC would have to maintain a facility at Cleveland (BKL).  You also made the statement that you had called and verified that there was no office space available at Cleveland (BKL) at this time.

3) That Century Jets, LLC negotiate a preferred fuel arrangement presumably to reduce the cost of fuel to Forest City.

(Ex. 28.) Mr. Sonson then went on to write that he and Century Jets' general counsel had reviewed the 2006 Agreements, and they believed that both parties were complying with the terms.  (*Id.*)[13]

Nevertheless, in an attempt to reconcile any differences between the companies, Mr. Sonson offered Mr. Snyder and Forest City the following alternatives "under the condition that [they are] not interpreted as a change or amendment to the existing agreements":

1) We [*i.e.*, Century Jets] will designate 2 Beechjet 400A Aircraft (93 & 95) as primary aircraft and a Gulfstream aircraft as backup.  Our intention at this time is (not to be misinterpreted as an agreement or promise) is to set up a full base at Cleveland (BKL).  At least one of these aircraft will be on the ground at BKL under a first right of refusal. . . .

---

[13]  For example, Mr. Sonson noted that there was no requirement under either the Beechjet or Hawker Agreement "that the aircraft to be used in charter operations for Forest City be based at Cleveland (BKL) or in any other location."  (*Id.*)

-28-

2) Forest City will have access to our facilities at Cleveland (BKL).  We have obtained an agreement in principle for space from Million Air (BKL).

3) Forest City will receive benefit from our fueling arrangement at BKL.  We have negotiated a special deal with World Fuel for BKL.

All aircraft are out on trips until March 19th, but I will attempt to arrange a showing of all aircraft at one time at BKL for Forest City personal [*sic*] sometime after that. We should be set up in some fashion at BKL after the showing.

(*Id.*)

68.  Mr. Snyder then sent a reply email to Mr. Sonson later that day.  (*Id.*; *see also* Tr. 54-55.) Mr. Snyder reiterated that, as of March 2, 2007, Century Jets had thirty days to cure its defaults under the 2006 Agreements.  (*Id.*)  Specifically, Mr. Snyder wrote in pertinent part:

I will review the details you outlined with our legal department.  I did notice a few items as I scanned your email.  In our discussion on March 5, just as we discussed on Friday, March 2, I indicated that we would "like to see our plane available in 30 days."  It is Forest City's understanding that you would provide a plane dedicated to Forest City at BKL based on the agreement and your representations.  I think "demands" is fairly strong language and believe that I indicated that we would work with you any way possible to make this a good partnership for both parties.

Please be advised that the 30-day period is still in place as we review your response below.

(Ex. 28.)

### 4.   Century Jets' Efforts to Alleviate Forest City's Concerns and to Designate a Primary Aircraft Under the Beechjet Agreement

69.  After receiving Mr. Snyder's reply email of March 8, 2007, Century Jets attempted to address Forest City's concerns or "demands" and also sought to designate a primary aircraft under the Beechjet Agreement.

70.  As part of those efforts, on March 12, 2007, Ms. Kelly of Century Jets telephoned Thomas Slavin, the then-CEO of Million Air FBO at Burke, and inquired as to whether Million Air had any hangar, maintenance, or office space available for Century Jets to rent or lease.  (Tr. 122,

-29-

130-45, 196, 198, 205-06, 219; Exs. 30.)  Mr. Slavin informed Ms. Kelly that, while there was no

space available to rent or lease, Century Jets could use Million Air's conference room on an as-

available basis and that a twenty-four advance notice was typically satisfactory.  (*Id.*)  In fact, Mr.

Slavin memorialized this conversation in an email he sent to Ms. Kelly later that morning, and he

wrote in pertinent part:

> You've disclosed to me that Century Jets has an important Cleveland area customer
> – a customer that you seek to service exceptionally well.  I related to you that I wish
> we could help you; however, we have neither hangar nor office space available at this
> time.  Moreover, there simply isn't any space for aircraft or aviation services
> available on our entire airport.  Since your company's aircraft have used our facility
> on many occasions over the past years, I offered you an interim alternative, to wit:
> "We have a very well appointed conference room that is designed for six, but will
> accommodate eight attendees.  There are numerous conference room amenities
> including: speaker phone, scrolling white board, T-1 line connectivity, and an in-
> place TV with either tape or VCR capabilities.  The conference room is available thru
> prior registration with an attending CSR at our front desk.  A 24 hour advance notice
> is typically satisfactory.  In addition, the Cleveland Clinic Foundation maintains an
> exceptionally well-appointed waiting room with an in-place computer.  This small
> waiting room is designed for CCF passengers or crew, but usage is sporadic.
> Therefore, if your client uses our conference room, and a break out area is required,
> the CCF area is directly across the corridor from the conference room."  There is no
> cost for this conference room space to fuel buying customers.

(Ex. 30 (emphasis added).)[14]  While Mr. Slavin later testified at trial that Million Air's conference

room was occupied quite frequently and would not be available to Century Jets and its customers

about two-thirds of the time (even with twenty-four hour advance notice), it was clear that Mr. Slavin

_____

[14]  Notably, in the same email, Mr. Slavin also informed Ms. Kelly that Century Jets could
possibly position an aircraft at Burke without rented or leased hangar space:

> Possibly you could position an aircraft here without hangarage?  The de-icing
> season is coming to a close so the risks of outside storage, at least during the near-
> term, are coming to an end.  Moreover, we can offer your company ramp space for
> a nominal monthly cost.  Please advise via email as to your plans.

(*Id.*)

-30-

had not informed Ms. Kelly or Century Jets that the conference room's availability was so limited. (Tr. 130-45.)  Instead, as Mr. Slavin testified, he "was trying to induce Regina Kelly who I never heard of before and Century Jets who I never heard of before to use our facility.  So I was not going to state that our conference room is only available one third of the time even if you notify us 24 hours in advance."  (Tr. 144.)  Therefore, at least as far as Century Jets understood, Mr. Slavin had provided written confirmation that Century Jets and its customers could continue using Million Air's conference room upon providing twenty-four hours advance notice.  Moreover, despite Mr. Slavin's testimony, Ms. Kelly credibly testified that Century Jets and/or its affiliated entities had, in fact, used Million Air's offices for its clients, upon the same 24-hour notice, several times over the years preceding the 2006 agreement.[15]  Ms. Kelly also testified credibly, moreover, that this past practice and the nature of the Million Air facilities was discussed during the parties' negotiations of the 2006 Agreements at the September 22, 2006 meeting in Nashua, New Hampshire.  (*See* Tr. 122, 130-45, 194-98, 205-06, 218-20, 254-56, 346-48; Exs. 30.)  It is true, moreover, that the time periods Mr. Slavin referred to as periods during which the conference room was regularly occupied were time periods during normal work hours, which were not the periods during which Forest City personnel would, if ever, likely be in need of the facilities.  (Tr. 182, 186-87 (stating that Forest City personnel would not normally be in need of facilities at BKL, but, if they were, it would be in the early morning or late evening time frames).)

71.  In addition to Ms. Kelly's communication with Mr. Slavin and her attempts to address

---

[15]  Notably, Mr. Slavin did not say that Million Air never provided services to Century Jets customers or to customers of Century Jets' affiliated entities, or that he had reviewed Million Air's records or questioned those employees involved in scheduling use of the office space, to determine whether Million Air had done so.  The Court does not believe, accordingly, that Mr. Slavin's testimony was either inconsistent with or undercut the credibility of Ms. Kelly's testimony regarding past experiences with Million Air.

Forest City's concerns, Mr. Sonson also sought to reconcile the dispute with Forest City and, in particular, took steps toward designating a primary aircraft under the Beechjet Agreement.  (Tr. 263-66, 275-77; Exs. 33, 1007, 1008.)[16]

72.  Specifically, on March 22, 2007, Mr. Sonson sent an email to Mr. Snyder, addressing some of Forest City's concerns and discussing how Century Jets intended to designate three planes as primary and secondary aircraft under the Beechjet Agreement.  (Tr. 263-66, 275-77; Exs. 33, 1007.)  Mr. Sonson also inquired as to when Mr. Snyder would be available to view the planes and meet the primary flight crews.  (*Id.*)  Mr. Sonson wrote in pertinent part:

> Please find enclosed pictures of the 3 aircraft Century Jets will designate as primary and secondary aircraft for the Forest City Beechjet 400A Block Hour Agreement of October 1, 2006. . . . You will be able to see the aircraft and meet the primary flight crews at BKL as the aircraft and crews become available from the flight schedule.  The 95 aircraft which will be designated "primary" should be able to view before the end of the month. . . .

> As a reminder, under the agreement, we are only required to designate one primary Beechjet 400A aircraft, and there is no set timetable for doing so.  As I stated in my email to you of March 8, 2007, and reiterated in our recent conversation, I want to continue to provide service at a level that meets or exceeds the contract requirements. . . . Also we have utilization of facilities at BKL with phone/fax and internet support as well as contract fueling arrangements with BKL and the surrounding Cleveland airports.

> Please provide dates in March and eary [*sic*] April that you would be available to personally view the aircraft and meet the primary flight crews.  I will officially designate the "primary" aircraft under the Beechjet Block Hour Agreement by Monday, March 26, 2007.  It would be our position, at that time, that the primary aircraft "TBD" status would be removed as the final issue to the agreement.  In the meantime we have been and will continue to operate under both agreements as written.

(Exs. 33, 1007.)

73.  On March 26, 2007, Mr. Sonson then emailed Mr. Snyder and specifically identified the

---

[16]  Exhibit 1007 includes emails that also are a part of Exhibit 33.

three planes that Century Jets was designating as the primary and secondary aircraft under the Beechjet Agreement.  (Tr. 263-66, 275-77; Exs. 33, 1007, 1008.)  Mr. Sonson wrote in pertinent part:

> The primary aircraft that Century Jets will name for the Beechjet Block Hour Agreement is N8283C.  We will back this up with another Beechjet N156DH and a Gulfstream N671LW per my prior email.  I will call tomorrow to let you know when we will be at Burke so you can see the aircraft and primary crew.

(Ex. 1008.)

74.  Then, later that week, *i.e.*, at some point during the last of week of March 2007, representatives from Forest City and Century Jets met at Burke to, *inter alia*, view Century Jets' proposed designated primary aircraft, tour the Million Air conference room, and potentially reconcile the dispute between the two companies.  (Tr. 104-06, 176-79, 181-82, 188-89, 201-03, 209-10, 265-66, 276-77, 366; *see also* Exs. 33, 1007, 1008.)  The participants at the meeting were as follows: Mr. Snyder and Ms. Abraham on behalf of Forest City and Mr. Sonson and Ms. Kelly on behalf of Century Jets.  (*Id.*)  During the meeting, Ms. Abraham noted that the proposed designated primary aircraft was "very nice" and that it was acceptable to her, particularly because the plane already had been used by Forest City executives.  (*Id.*)  Mr. Snyder, on the other hand, made no comment regarding the aircraft and neither accepted nor rejected Century Jets' proposal that the aircraft be the designated primary aircraft under the Beechjet Agreement.  (*Id.*)  Similarly, Mr. Snyder made no comment regarding the acceptability of the Million Air conference room.  (*Id.*)

### 5.      Forest City Terminated the Beechjet Agreement

75.  On April 4, 2007, without any further communication between the parties after the meeting at Burke, Forest City's corporate counsel sent Mr. Sonson and Century Jets a letter

terminating the Beechjet Agreement.  (Tr. 119-20, 277-78, 366; Exs. 35, 1010.)[17]  This letter, which

explicitly relates only to the "Block Hour Charter Agreement by and between [Century Jets] and

[Forest City] dated October 1, 2006 for 300 hours of aircraft flight time," *i.e.*, the Beechjet

Agreement, makes no reference whatsoever to the Hawker Agreement.  (*Id.*)

### 6.   The Parties' Performance Under the Hawker Agreement After Termination of the Beechjet Agreement

76.  After Forest City's termination of the Beechjet Agreement on April 4, 2007, it requested

that Century Jets provide private chartered jet services under the Hawker Agreement.  (Tr. 277-84;

Exs. 1012, 1018; *see also* Tr. 120-21.)[18]

77.  Forest City then made its second pre-payment under the Hawker Agreement, *i.e.*, made

a deposit to the third-party escrow account of $109,000, and thereafter flew several hours under the

Hawker Agreement up until June 27, 2007.  (Tr. 277-84; Exs. 1012, 1018.)

78.  Forest City has not requested a single flight under the Hawker Agreement since June 27,

2007.  (Tr. 277-84; Exs. 1012, 1018; *see also* Tr. 120-21.)  Further, Forest City has not made any

additional pre-payments under the Hawker Agreement.  (Tr. 281.)

79.  Forest City never informed Century Jets that it was in default of the Hawker Agreement,

or provided Century Jets a separate notice of termination – either written or verbal – with respect to

the Hawker Agreement.  (Tr. 277-84; *see also* Tr. 120-21.)

### G.   THE PARTIES FILE CLAIMS FOR BREACH OF THE 2006 AGREEMENTS

80.  On July 2, 2007, Forest City initiated this action in Ohio state court, alleging that

---

[17]  Exhibit 1010 is the same as Exhibit 35.

[18]  Notably, on April 27, 2007, Mr. Snyder sent an email to Mr. Sonson stating that "any future chartered jet trips should be applied against the 100-hr agreement, regardless of the aircraft flown for those trips."  (Ex. 1012.)

Century Jets breached the Beechjet Agreement.  (Doc. 1-1.)  Forest City's Complaint made no

reference whatsoever to the Hawker Agreement.  (*See generally id.*)

81.  After Century Jets timely removed the action to this Court, Forest City subsequently filed

a motion to amend its Complaint on December 27, 2007, which this Court granted at the Case

Management Conference.  (*See* Docs. 8, 11-12.)  Forest City's Amended Complaint alleges that

Century Jets breached both the Beechjet and Hawker Agreements, which it claims are separate but

interrelated contracts.  (Doc. 12.)[19]

82.  Century Jets then filed a Counterclaim against Forest City for breach of both the Beechjet

and Hawker Agreements.  (Doc. 15.)

83.  Pending the outcome of this litigation, the parties agreed to retain the remaining amounts

of Forest City's pre-payments under the Beechjet and Hawker Agreements in the third-party escrow

account.  (*See* Tr. 160-61; Ex. 50.)  As of August 31, 2007, exclusive of interest, the third-party

escrow account for the Beechjet Agreement contained $57,794.98, and the third-party escrow

account for the Hawker Agreement contained $30,548.  (*See id.*)  Under the terms of the parties'

agreements, it is undisputed that the third-party escrow account is Century Jets' account and that

Century Jets receives all the interest that has accrued in the account.  (Tr. 237; *see also* Tr. 299-300.)

## II.    **CONCLUSIONS OF LAW**

As noted, both Forest City and Century Jets have filed breach of contract claims against one

another, each asserting that the other party was in breach of the 2006 Agreements.  Forest City

alleges that Century Jets breached the separate but interrelated Beechjet and Hawker Agreements by:

(1) failing to maintain or base a plane at Burke for Forest City's use; and (2) failing to maintain an

---

[19]  As noted, Forest City also has filed a declaratory judgment claim, seeking a declaration
that it is released from any and all further obligations under the 2006 Agreements.  (*See id.*)

office facility at Burke for Forest City's use.  By contrast, Century Jets alleges that it complied with all of its performance obligations under the Beechjet and Hawker Agreements and that Forest City breached the 2006 Agreements by wrongfully declaring Century Jets to be in default and failing to make required payments.

To prevail on a claim for breach of contract under Virginia law,[20] a plaintiff must establish the following three elements:  (1) a legal obligation of a defendant to a plaintiff; (2) a violation or breach of that obligation; and (3) a consequential injury or damage to the plaintiff.  *Hamlet v. Hayes*, 641 S.E.2d 115, 117 (Va. 2007) (citing *Caudill v. Wise Rambler*, 168 S.E.2d 257, 259 (Va. 1969)).

Here, for the reasons articulated in more detail below, the Court concludes that Century Jets has established both of its breach of contract claims against Forest City and that Century Jets is entitled to damages in the amount of $1,330,637.50.  More specifically, based on the above findings of fact and applicable Virginia law, the Court concludes that:

(1)     Forest City did not establish a breach of contract claim against Century Jets, because:  (a) Century Jets did not owe Forest City a legal obligation to maintain or base a plane at Burke for Forest City's use; and (b) Century Jets granted Forest City "full access to its office facility" in accordance with the Beechjet Agreement;

(2)     Century Jets established a breach of contract claim against Forest City, because Forest City wrongfully terminated the 2006 Agreements and breached its obligations to Century Jets by failing to make required payments; and

(3)     Century Jets proved lost-profits damages of $1,330,737.50.

---

[20]  It is undisputed that Forest City and Century Jets agreed that the Beechjet and Hawker Agreements would be "interpreted and governed by the laws of the State of Virginia."  (Exs. 2001 & 2002 at ¶ 15(b).)  Accordingly, the Court will apply the principles and rules of Virginia contract law.

A.      FOREST CITY'S CLAIM FOR BREACH OF THE 2006 AGREEMENTS

Forest City contends that Century Jets breached the Beechjet Agreement in two respects:  (1) by failing to maintain or base a plane at Burke for Forest City's use; and (2) by failing to maintain an office facility at Burke for Forest City's use.  Forest City then asserts that Century Jets' breach of the Beechjet Agreement constitutes a breach of the separate Hawker Agreement.

As discussed below, however, the Court concludes that Century Jets did not breach the Beechjet Agreement, let alone the Hawker Agreement, and that Forest City's claim for breach of the 2006 Agreements therefore must fail.

1.      Century Jets Did Not Agree to Base a Plane at Burke

Forest City's first basis for asserting that Century Jets breached the Beechjet Agreement – that Century Jets failed to maintain or base a plane at Burke for Forest City's use – is unsustainable, because Forest City did not establish that Century Jets owed such a legal obligation to Forest City. *See Hamlet*, 641 S.E.2d at 117.

a.      No Provision in Either Agreement

As a threshold matter, it is undisputed that there is no written provision in either the Beechjet Agreement or the Hawker Agreement requiring Century Jets to maintain or base a plane at Burke for Forest City's use.  (*See generally* Exs. 2001 & 2002; *see also* Tr. 52; Doc. 45 at 15; Tr. 382 ("[T]he Beechjet Agreement does not say that a Beechjet will be placed at Burke.").)  Forest City argues that, despite the absence of such a provision in either agreement, this Court should supplement the Beechjet Agreement consistent with what it says was the parties' intent to include this obligation, and then find this same obligation to be part of the Hawker Agreement because the two agreements are so interrelated that any obligations governing one should be deemed to govern the other.  (Tr. 403.)

-37-

      **b.**    **Forest City's Parol Evidence May Not Be Used to Vary the Terms of the Agreements**

Well-settled Virginia law and the integration clause in the Beechjet Agreement preclude Forest City from relying on parol evidence to prove that Century Jets was legally obligated to maintain or base a plane at Burke for Forest City's use, however.

The Supreme Court of Virginia has stated that the "rule which excludes parol evidence when offered to vary the terms and conditions of an integrated written contact has nowhere been more strictly adhered to in its integrity than in Virginia." *Jim Carpenter Co. v. Potts*, 495 S.E.2d 828, 832 (Va. 1998) (quoting *Pulaski Natl. Bank v. Harrell*, 123 S.E.2d 382, 387 (Va. 1962)).

> It, in effect, declares that, where parties have reduced their contract to a writing which imposes a legal obligation in clear and explicit terms, the writing shall be the sole memorial of that contract, and it is conclusively concluded that the writing contains the whole contract and is the sole evidence of the agreement.

*Id.*; *see also In re: BNX Systems Corp.*, 310 Fed. Appx. 574, 576 (4th Cir. 2009) (quoting *Godwin v. Kerns*, 17 S.E.2d 410, 412 (Va. 1941) ("In Virginia, no general rule seems to be better settled than that, in controversies between two parties to a contract, parol evidence of prior or contemporaneous oral negotiations or stipulations is inadmissible to vary, contradict, add to, or explain the terms of a complete, unambiguous, unconditional, written instrument.").

Here, Virginia's parol evidence rule prohibits exactly what Forest City attempted to do at trial. By its own terms, the Beechjet Agreement is a complete and integrated written agreement: "This Agreement and Attachments 1 through 5 constitute the entire understanding between the parties and there are no representations, warranties, conditions, covenants or agreements other than as set forth expressly herein." (Ex. 2001 at ¶ 15(d).) In the face of this explicit provision, however, through testimony by Mr. Snyder and the introduction of several emails, Forest City improperly offered evidence of negotiations that took place prior to the execution of the Beechjet Agreement

in an effort to establish that the parties agreed that Century Jets would base a plane at Burke for Forest City's use, *i.e.*, agreed to a contract term that is not apparent on the face of the contracts. This evidence, which attempted to add an obligation that was not stated in the integrated Beechjet Agreement, is improper under the parol evidence rule. Indeed, had the parties proceeded to trial by jury, the Court would have been required to exclude all reference to it, as Century Jets' pre-trial motions asked it to do. (*See* Doc. 32; Non-document Order entered August 12, 2008); *accord In re: BNX Systems Corp.*, 310 Fed. Appx. at 576 (applying Virginia law and affirming the lower courts' decisions declining to admit parol evidence offered to prove a term not expressly stated in an integrated contract).[21]

In this regard, the Court rejects Forest City's contention that two exceptions to the parol evidence rule – the partial integration doctrine and the collateral contract doctrine – render the evidence offered by Forest City admissible. (*See* Doc. 45 at 16 n.6.) The Supreme Court of Virginia has explained that the partial integration doctrine is applicable only where the entire agreement has not been reduced to writing:

> [T]he partial integration doctrine recognizes that the final form of a contract between parties may not reflect the complete agreement of the parties or accurately reflect the course of dealing between parties based on their complete agreement. In such circumstances, "where the entire agreement has not been reduced to writing, parol evidence is admissible, not to contradict or vary its terms but to show additional independent facts contemporaneously agreed upon, in order to establish the entire contract between the parties."

---

[21] Because Century Jets objected to Forest City's attempt to use parol evidence in its pre-trial motion in limine, it is irrelevant that Century Jets did not object every time such evidence was proffered at trial. The Court made it clear at the final pre-trial conference that it would consider *all* the parties' evidence during the bench trial and then re-examine the arguments made by the parties in their motions in limine after trial in assessing the evidence upon which it could appropriately rely in reaching its conclusions. (*See* Non-document Order entered August 12, 2008.)

*Jim Carpenter Co.*, 495 S.E.2d at 833 (quoting *High Knob, Inc. v. Allen*, 138 S.E.2d 49, 52 (Va. 1964).  Here, as noted, the Beechjet Agreement, by its own terms, was a completely integrated written agreement.  Consequently, the partial integration doctrine is inapplicable.  Similarly, the collateral contract doctrine, which states that parol evidence is admissible as "proof of a prior or contemporaneous oral agreement that is independent of, collateral to and not inconsistent with the written contract, and which would not ordinarily be expected to be embodied in the writing," is inapplicable, because the Beechjet Agreement was completely integrated. *Id.*  Even if the agreement was not completely integrated, moreover, both doctrines would be inapplicable, because an additional provision requiring Century Jets to base a plane at Burke for Forest City's use would contradict or be inconsistent with several of the written terms of the Beechjet Agreement and certainly would have been put in writing if intended to be a binding obligation.  For example, the Beechjet Agreement expressly provides that the primary aircraft to be furnished was on a "non-exclusive" basis, not only subject to a minimum twenty-four hour notice requirement, but, perhaps most importantly, also subject to Century Jets' right to substitute other aircraft "for any reason" if the primary aircraft was unavailable. (*See* Ex. 2001 at ¶¶ 1, 7, Attachment 1, Attachment 3.)  Under the written terms of the Beechjet Agreement, therefore, Century Jets simply was required to provide chartered jet services to Forest City on twenty-four hours notice, and Century Jets had the discretion and flexibility to determine the precise manner in which it provided such services.

Accordingly, Forest City's proffered evidence of an additional agreement that would restrict Century Jets' discretion under the written terms of the Beechjet Agreement is impermissible and this Court may not rely upon it to rewrite the parties agreements.

     **c.**     **As a Factual Matter, Century Jets Did Not Make an Unconditional Promise to Base a Plane at Burke**

If this Court were permitted to consider the parties' parole evidence, moreover, it would and does conclude that, based on its consideration of the entire trial record and the above findings of fact, Century Jets and Forest City simply never reached an agreement that Century Jets would be required to maintain or base a plane at Burke for Forest City's use.  Mr. Sonson credibly testified at trial that it merely was his intent and business plan to establish a base of operations in the greater Cleveland area and that he expressly refused to incorporate a provision in the Beechjet Agreement that would require Century Jets to base a plane at Burke.[22]  Further, none of the documents offered at trial, including the emails before and after the execution of the Beechjet Agreement, contained an unconditional promise that Century Jets would base a plane at Burke.  Instead, the Court notes that the conspicuous absence of a written provision in the Beechjet Agreement requiring Century Jets to base a plane at Burke – even though Forest City is a sophisticated entity who utilized legal counsel in negotiating the agreement – is highly probative that such a promise was never made.  Indeed, the Court concludes that Forest City has failed to establish by a preponderance of the evidence that Century Jets owed Forest City the legal obligation to maintain or base a plane at Burke for Forest City's use.[23]  Accordingly, Forest City's first basis for asserting that Century Jets breached the

---

    [22]  The Court notes that it also credited the testimony of Ms. Kelly, who similarly testified that it was Century Jets' business plan to establish a base in the greater Cleveland area and that Mr. Sonson expressly informed Mr. Snyder at the September 22, 2006 meeting in Nashua, New Hampshire that Century Jets would not agree to base a plane at Burke.

    [23]  It is arguable that, because it has essentially sought to reform an otherwise unambiguous contract, Forest City had the burden of establishing the parties' intent to include this additional obligation by clear and convincing evidence. *See Reid v. Boyle*, 527 S.E. 137, 144-45 (Va. 2000).  Because the Court concludes that Forest City can not even establish its claim by the lower preponderance of the evidence standard, the Court need not further address the appropriate burden of proof to be applied in this context.

-41-

Beechjet Agreement is unsustainable.  *See Hamlet*, 641 S.E.2d at 117.

>    **2.**     **Century Jets Granted Forest City "Full Access to Its Office Facility"**

Forest City's second basis for asserting that Century Jets breached the Beechjet Agreement – that Century Jets failed to maintain an office facility at Burke for Forest City's use – also is unsustainable, because Century Jets granted Forest City "full access to its office facility" in accordance with the terms of paragraph 3(c) of the Beechjet Agreement, *i.e.*, Century Jets did not violate or breach the legal obligation that it owed Forest City.  (Ex. 2001 at ¶ 3(c)); *see Hamlet*, 641 S.E.2d at 117.  As discussed in more detail below, the Court concludes that the text of the Beechjet Agreement regarding the office facility is ambiguous, vague, and indefinite and, consequently, that extrinsic evidence offered at trial <u>can</u> be used to ascertain the intention of the parties.  And here, the evidence shows that the parties understood the "office facility" referenced was to be the conference room owned by Million Air, which Century Jets had access to as a customer and, in turn, offered to Forest City in compliance with the Beechjet Agreement.

>    **a.**     **Paragraph 3(c) of the Beechjet Agreement**

In paragraph 3(c) of the Beechjet Agreement, the parties agreed to the following provision regarding Forest City's right to access an office facility:  "[Century Jets] will grant [Forest City] full access to its office facility (phone/fax/internet/meetings) at Cleveland Burke Lake [*sic*] Airport

(BKL)."[24]  (*Id.*)

### b.    Paragraph 3(c) Is Ambiguous, Vague, and Indefinite

Under Virginia law, whether particular terms of a contract are ambiguous is a question of law.  *Commonwealth Group-Winchester Partners, L.P. v. Winchester Warehousing, Inc.*, No. 08-1460, 2009 U.S. App. LEXIS 13816, at *12 (4th Cir. June 26, 2009) (citing *Musselman v. Glass Works, L.L.C.*, 533 S.E.2d 919, 921 (Va. 2000)).  If contract language is capable of being understood in more than one way, it is ambiguous.  *Video Zone, Inc. v. KF & F Properties, L.C.*, 594 S.E.2d 921, 923 (Va. 2004).  Such an ambiguity, however, if it exists, must appear on the face of the contract.  *Id.* at 924; *see also Ross v. Craw*, 343 S.E.2d 312, 316 (Va. 1986) ("A contract is not deemed ambiguous merely because the parties disagree as to the meaning of the language they used to express their agreement.").  In determining whether a disputed term is ambiguous, courts "consider the words employed in the contract in accordance with their usual, ordinary, and popular meaning." *Id.*

Here, upon examining paragraph 3(c) of the Beechjet Agreement in light of applicable Virginia contract law, the Court concludes that the phrase "its office facility (phone/fax/internet/meetings)" is ambiguous, vague, and indefinite on its face in at least two respects.  First, the term "its," while generally referring to Century Jets, is "capable of being

---

[24]  While the Beechjet Agreement includes this provision regarding office space in § 3(c), this provision does not appear in § 3(c) – or any other section – of the Hawker Agreement. Although Forest City argues that the 2006 Agreements are "interrelated," the Court is unpersuaded that Virginia law would either require or permit the Court to incorporate provisions from the Beechjet Agreement into the Hawker Agreement, which is different from the Beechjet Agreement in several material respects.  The Court need not reach or further analyze these arguments, however, because the Court's conclusion that Century Jets did not breach its obligations under the Beechjet Agreement would mandate the same conclusion as to the Hawker Agreement, even if the two were interrelated as a matter of law as Forest City argues.

understood in more than one way" and therefore is ambiguous.  *See Video Zone, Inc.*, 594 S.E.2d at

923.  Specifically, the term "its" is a possessive pronoun and refers to some form of a property right

on the broad spectrum of potential property rights that Century Jets can have in the "office facility"

at issue, *i.e.*, a fee simple interest, a leasehold, or merely a right to use.  In other words, the precise

nature of Century Jets' property right identified by "its" in the Beechjet Agreement is uncertain,

because the extent of Century Jets' property right in the "office facility" could be anywhere along

the continuum of potential property rights.  Second, the term "office facility," especially because it

is limited and defined in part by the parenthetical "phone/fax/internet/meeting," is vague, indefinite,

and susceptible to multiple meanings.  Other than being located at Burke, it is unclear exactly what

constitutes the "office facility," *e.g.*, is the "office facility" an office where Century Jets' employees

are working, or is the "office facility" an empty meeting conference room with phone, fax, and

internet capability.

     **c.**   **Extrinsic Evidence Demonstrates That The "Office Facility" Was Million Air's Conference Room**

    Where, as here, the language of a contract is ambiguous, Virginia law provides that courts

may admit parol or extrinsic evidence, "not to contradict or vary contract terms, but to establish the

real contract between the parties."  *Tuomala v. Regent Univ.*, 477 S.E.2d 501, 505 (Va. 1996); *see*

*also Video Zone, Inc.*, 594 S.E.2d at 924.  In fact, as noted by the Fourth Circuit in a case applying

Virginia law:

> The rule excluding parol evidence has no application where the writing on its face
> is ambiguous, vague, or indefinite.  In such a case, the proper construction of the
> contract is an issue for the trier of fact, and the court should receive extrinsic
> evidence to ascertain the intention of the parties and to establish the real contract
> between them.

*SER Solutions, Inc. v. Masco Corp.*, 103 Fed. Appx. 483 (4th Cir. 2004) (quoting *Cascades N.*

-44-

*Venture Ltd. P'ship v. PRC, Inc.*, 457 S.E.2d 370, 373 (Va. 1995)). This is true even where the contract at issue includes an integration clause. *See Prospect Dev. Co. v. Bershader*, 515 S.E.2d 291, 296 (Va. 1999) ("[T]he integration clause does not prohibit the admission of parol evidence which does not contradict or vary the terms of the real estate contract, but rather explains the meaning of the term 'premium lot.'").

The Court, therefore, examines the extrinsic evidence offered at trial on this issue to ascertain the intention of the parties and concludes that "its office facility (phone/fax/internet/meetings)" in paragraph 3(c) of the Beechjet Agreement refers to the conference room owned by Million Air to which Century Jets and its customers had access when flying in or out of Burke. In support, the Court relies on Mr. Sonson's and Ms. Kelly's credible testimony that the Million Air conference room was identified as the "office facility" during the September 22, 2006 meeting in Nashua, New Hampshire, as well as Mr. Snyder's admission that he knew Century Jets did not own or lease an office facility when the Beechjet Agreement was executed on October 1, 2006. The Court also relies on Mr. Slavin's email to Ms. Kelly on March 12, 2007, which confirmed that Century Jets and its customers had access, or the right to use, Million Air's conference room, *i.e.*, a limited property interest, and that this conference room was suitable for "meetings" and had "phone," "fax," and "internet" capability. Further, as evidenced by the testimony and documents offered at trial, the Million Air conference room appears to be the type of "office facility" that would benefit Forest City, *i.e.*, a place where Forest City's executives could "perform business" before or after a flight. (Tr. 102.) As such, the Court concludes that the Million Air conference room was indeed the "office

facility" identified in paragraph 3(c) of the Beechjet Agreement.[25]

### d.    Forest City Had Access to Million Air's Conference Room

Having construed the ambiguous language in paragraph 3(c) of the Beechjet Agreement to refer to Million Air's conference room, it is clear that Forest City's second basis for asserting that Century Jets breached the Beechjet Agreement – that Century Jets failed to maintain an office facility at Burke for Forest City's use – is unsustainable.  For years, Century Jets and its customers have had access to Million Air's conference room and, in March 2006, received written confirmation in Mr. Slavin's email that the room continued to be available upon twenty-four hours advance notice – precisely the notice required for Century Jets to guarantee availability of private chartered jet services to Forest City under the Beechjet Agreement.[26]  Therefore, Century Jets was able to grant Forest City "full access to its office facility (phone/fax/internet/meetings)" in accordance with the terms of the Beechjet Agreement and did not violate or breach the legal obligation that it owed

---

[25]  In this regard, Forest City's contention that Century Jets, as drafter of the Beechjet Agreement, could have written that the "office facility" was Million Air's conference room is not dispositive.  (*See* Doc. 45 at 25.)  While Virginia courts generally will construe a contract "more strictly against the party who prepared it," *see Mahoney v. NationsBank of Virginia, N.A.*, 455 S.E.2d 5, 9 (Va. 1995), this rule of contract construction – often referred to as *contra proferentem* – is inappropriate where, as here, "experienced and sophisticated business persons of relatively equal bargaining power have negotiated a contract," *FabArc Steel Supply, Inc. v. Composite Constr. Sys.*, 914 So.2d 344, 360 (Ala. 2005) (collecting cases).  Moreover, *contra proferentem* generally is a "rule of last resort, a 'tie-breaker' of sorts, that comes into play only when neither the extrinsic evidence nor other methods of construction can resolve the ambiguity."  *See, e.g.*, *Baker v. America's Mortg. Serv.*, 58 F.3d 321, 327 (7th Cir. 1995).  And here, the extrinsic evidence presented at trial conclusively resolves the ambiguity in paragraph 3(c).

[26]  While this communication came after the execution of the agreement, it merely confirmed the understanding of the parties as of the earlier negotiations on this issue in Nashua, New Hampshire.  Because it came within the thirty (30) day cure period under the contract, moreover, it would have cured any default arising out of any earlier failure to confirm the availability of the facility referenced in the Beechjet Agreement.

Forest City, particularly when Forest City never once sought or requested access to the "office facility."[27]  *See Hamlet*, 641 S.E.2d at 117.

* * *

Accordingly, in light of all of the foregoing, the Court concludes that Forest City did not establish that Century Jets breached the Beechjet Agreement.  Because Century Jets did not breach the Beechjet Agreement, Century Jets also did not breach the Hawker Agreement under Forest City's theory that a breach of the former agreement constituted a breach of the latter.  Forest City's claim that Century Jets breached the 2006 Agreements, therefore, must be denied.

## B.    CENTURY JETS' CLAIM FOR BREACH OF THE 2006 AGREEMENTS

Century Jets contends that Forest City breached the Beechjet and Hawker Agreements by wrongfully declaring Century Jets to be in default and failing to make required payments.  As discussed briefly below, the Court concludes that Century Jets has established a breach of contract claim against Forest City.

First, as noted, Century Jets did not breach the Beechjet and Hawker Agreements, but instead

---

[27]  In the alternative, to the extent that Forest City argues that § 3(c) of the Beechjet Agreement contains an implied promise or representation to obtain dedicated office space at Burke, that contractual obligation would fall under the representations and warranties provision of the agreement, *i.e*, § 13(b), which states that "default" occurs only "if any representation or warranty made by either party . . . shall prove to have been incorrect in any material respect at the time made and shall remain incorrect at the time in question . . . ."  Section 13(b) expressly requires a showing of materiality.  It is undisputed that Forest City never sought to use office space at Burke. (Tr. 104.)  Further, as discussed in the Findings of Fact, Forest City's need for office space at Burke was minimal given the proximity of its own offices to the airport. Therefore, Forest City is now arguing that it terminated a multi-million dollar contract on the basis of a provision it had little need for and never sought to utilize.  Accordingly, even if the Court could conclude that Century Jets' access to the Million Air conference room was a breach of its obligations under § 3(c) of the Beechjet Agreement, it was not material.  Indeed, it is so immaterial that it seems like nothing more than a thinly veiled pretext to breach a contract Forest City no longer found necessary or favorable.

-47-

complied with all of its performance obligations under the 2006 Agreements. Forest City, therefore, wrongfully terminated the Beechjet and Hawker Agreements.

Despite this wrongful termination, however, Forest City argues that it still did not breach the 2006 Agreements, because it has no remaining obligations to Century Jets. More specifically, Forest City asserts that: (1) it is not required to use any of the hours under the Beechjet and Hawker Agreements; and (2) because it is not so required, and because it will not use Century Jets' services in the future, it should not be required to continue to make deposits into the third-party escrow account.

Forest City's argument, though, is without merit and can be easily dismissed. In its post-trial brief, Forest City advises the Court that, under Virginia law, "[i]n interpreting a contract, a court should read the contract as a single document and give meaning to every clause where possible." (Doc. 45 at 29 (quoting *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999).) Forest City then proceeds to omit the critical term of the 2006 Agreements, *i.e.*, that Century Jets agreed to furnish Forest City, and Forest City agreed to pay for, a "guaranteed" block of 300 hours of jet service per one-year term under the Beechjet Agreement and 100 hours of jet service per one-year term under the Hawker Agreement. (*Compare* Doc. 45 at 29 *with* Exs. 2001 & 2002 at ¶ 3(a).) This "guarantee" to pay for a specified number of hours of jet service is the fundamental aspect of the Beechjet and Hawker Agreements; in fact, without the "guarantee," Forest City would not have committed itself to do anything under the 2006 Agreements, while Century Jets still would have been required to provide jet services to Forest City upon twenty-fours notice and at the negotiated rates. Further, the 2006 Agreements are best understood in terms of guaranteed hours, as all of the accounting under the contracts is handled in hours, rather than charges of money. For example, the cancellation and interchange aircraft provisions in the 2006 Agreements debit or credit

-48-

hours against the balance of Forest City's unused Allocated Hours, rather than charge Forest City specific amounts of money. (*See* Exs. 2001 & 2002 at ¶ 9, Attachment 5; *see also* Tr. 290-91.)

In contrast to Forest City's position, Century Jets' interpretation of the 2006 Agreements "gives meaning to every clause" and reflects the plain meaning of the parties' contractual language. *See Hitachi Credit America Corp.*, 166 F.3d at 624. For example, paragraph 4(a) of both the Beechjet and Hawker Agreements, *i.e.*, the reconciliation clause, is reasonably understood to relate to reconciling Forest City's pre-payments of the "guaranteed" block hours with the bifurcated rates for round-trip and one-way flights – not a return of all funds for unused hours as Forest City contends. Indeed, even if paragraph 4(a) was considered ambiguous, the most credible explanation offered at trial was the one provided by Mr. Sonson's and Ms. Kelly's testimony, *i.e.*, that the introduction of the bifurcated rates in the 2006 Agreements required that a reconciliation clause be inserted and that this clause was explicitly discussed at the September 22, 2006 meeting in Nashua, New Hampshire. Conversely, Mr. Snyder's and Forest City's explanation would render the "guarantee" language in paragraph 3(a) and the forfeiture of hours language in paragraph 10 meaningless and would be inconsistent with their own repeated contentions about the financial significance, or the "magnitude," of the 2006 Agreements. (*See, e.g.*, Tr. 107.) As Century Jets notes in its post-trial brief, Forest City's position that the Beechjet and Hawker Agreements require a return of all funds for unused hours is contrary to: (1) the fundamental guarantees in the 2006 Agreements; (2) the conduct of the parties in deferring commencement of the 2006 Agreements until November 30, 2006; and (3) the origin of the reconciliation clause in the 2006 Agreements. (*See* Doc. 46 at 76.)

In sum, therefore, the Court concludes that Century Jets established a breach of contract claim against Forest City, because Forest City did owe legal obligations to Century Jets. More

specifically, the Court concludes that:  (1) Forest City owed a legal obligation to Century Jets to make the required pre-payments set forth in the 2006 Agreements; (2) Forest City breached that obligation by failing to make the payments; and (3) Century Jets suffered a consequential injury or damage, *i.e.*, it did not receive the required payments.  *See Hamlet*, 641 S.E.2d at 117.[28]

### C.    CENTURY JETS IS ENTITLED TO DAMAGES IN THE AMOUNT OF $1,330,637.50

In its pre-trial and post-trial briefs, Century Jets has offered three alternative theories of damages:  (1) the full amount of Forest City's required pre-payments that were not paid but due under the 2006 Agreements (the "Escrow Damages Claim"); (2) an amount equal to Century Jets lost profits (the "Lost-Profits Damages Claim"); and (3) an amount equal to the interest that Century Jets would have earned on all of Forest City's pre-payments due under the 2006 Agreements (the "Interest Damages Claim").  (*See* Doc. 46 at 79-97; *see also* Doc. 36 at 28-32.)[29]

As discussed in more detail below, the Court concludes that, while Century Jets is not entitled to either the Escrow Damages Claim or the Interest Damages Claim, Century Jets is entitled to a portion of its Lost-Profits Damages Claim.  Specifically, the Court concludes that Century Jets is entitled to damages in the amount of $1,330,637.50.

### 1.    Century Jets Is Not Entitled to Its Escrow Damages Claim

In its Escrow Damages Claim, Century Jets effectively contends that paragraph 10 of both the Beechjet and Hawker Agreements is a liquidated damages provision, requiring that it be paid the full amount of Forest City's remaining pre-payments due under the 2006 Agreements –

---

[28]  Again, Forest City's contention that its interpretation of the 2006 Agreements should govern because of *contra proferentem* is not persuasive.  *See* footnote 20, *supra*.

[29]  As discussed in more detail below, Century Jets explicitly declined to seek specific performance of the 2006 Agreements.  (Doc. 46 at 79.)

approximately $5,127,000.  (*See* Doc. 45 at 41.)[30]  In support, Century Jets argues that it "has long

been the law of Virginia that a party entering into a contract aware of the direct consequences of his

breach is liable for all such direct damages" and that the evidence at trial established that Forest City

was fully aware of its liability in the event it chose to breach its contractual commitments.  (Doc. 46

at 83-84 (citing *Western Union Tel. Co. v. Reynolds Bros.*, 77 Va. 173, 186 (1883).)  Century Jets

is correct that Forest City knowingly breached the agreements and that the agreements spell out very

specific payment obligations to which Forest City knowingly acceded.  It is true, moreover, that

Forest City entered into the 2006 Agreement with an understanding that it had guaranteed Century

Jets payments for a five year term in return for a number of material concessions from Century Jets,

including concessions relating to payments due on its earlier guarantees under the 2004 Agreement.

That does not end the inquiry, however.

Even assuming that paragraph 10 of the Beechjet and Hawker Agreements did constitute a

liquidated damages provision, as the Court finds the parties intended it to, Century Jets still would

not be entitled to its Escrow Damages Claim under Virginia law.  As a liquidated damages provision,

paragraph 10 is invalid and unenforceable, because it would amount to an impermissible penalty or

forfeiture.

In Virginia, the test for determining the validity of a liquidated damages provision is well-

settled:

> [P]arties to a contract may agree in advance about the amount to be paid as
> compensation for loss or injury which may result from a breach of the contract
> [w]hen the actual damages contemplated at the time of the agreement are uncertain
> and difficult to determine with exactness and when the amount fixed is not out of all
> proportion to the probable loss. . . . [A] liquidated damages clause will be construed

---

[30] Century Jets actually does not request a sum certain; instead, Century Jets submits that
the precise amount will be affected by present value and interest calculations.  (Doc. 46 at 83.)

as an unenforceable penalty when the damage resulting from a breach of contract is susceptible of definite measurement, or where the stipulated amount would be grossly in excess of actual damages. . . . The party challenging the validity of a liquidated damages clause has the burden of proof on the issue of whether the opposing party's damages . . . are susceptible of definite measurement or . . . the stipulated damages are grossly in excess of the actual damages suffered by the non-breaching party.

*Boots, Inc. v. Singh*, 649 S.E.2d 695, 697 (Va. 2007) (internal quotations and citations omitted).

Here, Forest City has carried its burden of proving that Century Jets' claimed "stipulated damages are grossly in excess of the actual damages suffered." *See id.* Specifically, Century Jets claims that it has made an average gross profit of 32.5% under the flights flown under the 2004 and 2006 Agreements. Assuming that this percentage is accurate (and even this percentage is high because it does not include Century Jets' overhead costs), Century Jets' total profit from the 2006 Agreements would have been $1,823,250 had the 2006 Agreements been completely performed (32.5% of $5,610,000).[31] Century Jets' Escrow Damages Claim, however, is for approximately $5,127,000, which represents about 92% of the total contract price under the 2006 Agreements ($5,600,000) – an amount that is out of all proportion to Century Jets' probable loss and is grossly excessive to Century Jets' claimed actual damages. So, even though the parties agreed in advance about the amount that Forest City was to pay under the 2006 Agreements, fairly or not, Virginia law prohibits Century Jets from enforcing this provision and receiving damages that would constitute an impermissible penalty or forfeiture. *Compare id.* at 698 (noting that the Supreme Court of Virginia

---

[31] Granted, as Century Jets would contend, Forest City may not have flown every hour under the 2006 Agreements, and Century Jets therefore could have realized greater profits. The Court finds this irrelevant, however, because the relevant inquiry is what constitutes the actual amount of damages contemplated at the time of the agreement, and, at the time of the agreement, the parties contemplated that all hours would be flown. (*See generally* Exs. 2001 & 2002.) Further, even if the parties contemplated that some hours would not to be flown, the amount of the Escrow Damages Claim still would be grossly in excess of the actual damages suffered by Century Jets.

had upheld deposits of deposits of 3.3%, 4.6%, and 10% of the contract price as enforceable liquidated damages); *see also 301 Dahlgren Ltd. Partnership v. Board of Supervisors*, 396 S.E.2d 651, 653 (Va. 1990) (noting that a provision requiring a 50% refund "appears to be a penalty"); Restatement (2d) Contracts, § 340, comment a, illustration 1 ("A leases a building to B for five years at a rental of $1,000 per month, B depositing $10,000 as security for performance of all his covenants in the lease, to be retained by A in case of any breach on B's part, otherwise to be applied in payment of rent for the last ten months.  The provision for forfeiting the deposit in case of any breach is a provision for a penalty and is not enforceable.").

### 2. Century Jets Is Entitled to a Portion of Its Lost-Profits Damages Claim

In its Lost-Profits Damages Claim, Century Jets contends that it is entitled to:  (1) two additional pre-payments under the Hawker Agreement that were due before Forest City filed its Amended Complaint alleging that the Hawker Agreement was breached; and (2) an amount of lost profits derived from flights flown under the 2004 and 2006 Agreements.  (Doc. 46 at 87-88.)  In particular, based on the testimony of Mr. Sonson and the exhibits introduced at trial, Century Jets submits that it earned an average gross profit of 32.5% on all flights chartered for Forest City and incurred annual overhead costs attributable to Forest City in the amount of $19,008.  (*See* Tr. 287-

302; Exs. 1019, 1026 1027, 1030-32.)[32]  Century Jets, however, did not identify a specific dollar figure for its Lost-Profits Damages Claim, because it contends that, in light of Forest City's breach, there is uncertainty as to how many hours Forest City would have flown under the 2006 Agreements, *i.e.*, Forest City may not have flown all the hours under the 2006 Agreements, such that Century Jets may have realized an even greater profit.

In response, Forest City argues that Century Jets' Lost-Profits Damages Claim is prohibited by Virginia law, because it is speculative and conjectural, and because Century Jets failed to prove with reasonable certainty any amount to which it claims it is entitled.  In other words, Forest City challenges the sufficiency of Century Jets' evidence, asserting that Century Jets did not present accurate information concerning its past earnings and failed to account for various future possibilities, *e.g.*, that Forest City may not have flown the more expensive, one-way trips only.

Upon a review of the parties' arguments, the evidence offered at trial, and applicable Virginia law, however, the Court concludes that Century Jets is entitled to a portion of its Lost-Profits Damages Claim.  While Century Jets is not entitled to full payment of the two additional pre-payments they claim were due under the Hawker Agreement (because such damages, as indicated

---

[32]  The annual overhead costs attributable to Forest City were calculated by the following sequence:

    (1)      adding the annual salary of Century Jets' single employee ($70,000) and Century Jets' annual office expenses ($18,000), which equaled $88,000; and

    (2)      multiplying the total of Century Jets' annual expenses ($88,000) to the percentage of Century Jets' business attributable to Forest City (21.6%), which equaled $19,008.

(*See id.*)

-54-

above, would constitute an impermissible penalty),[33] Century Jets has offered sufficient evidence to establish damages in the amount of $1,330,637.50.

Under Virginia law, it is "well settled that damages are recoverable for loss of profits prevented by a breach of contract only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." *Western Insulation, LP v. Moore*, 242 Fed. Appx. 112, 119 (4th Cir. 2007).  A plaintiff, however, "is not required to prove the amount of his damages with mathematical precision; he is required only to produce sufficient facts and circumstances that will permit [the fact-finder] to make an intelligent and reasonable estimate of the amount." *Commercial Business Sys. v. Bellsouth Servs.*, 453 S.E.2d 261, 268 (Va. 1995) (citing *Goldstein v. Kaestner*, 413 S.E.2d 347, 349-50 (Va. 1992)).  Further, "[a] litigant is not required to prove his damages with precision, particularly where the violator of the contract has made it impossible for him to do so, provided [that] the evidence permits an intelligent and reasonable estimate of the damages.  *United Virginia Bank v. Dick Herriman Ford, Inc.*, 210 S.E.2d 158, 161 (Va. 1974).  And finally, where, as here, "an established business, with an established earning capacity, is interrupted and there is no other practical way to estimate the damages thereby caused, evidence of the prior and subsequent record of the business has been held admissible to permit an

---

[33] At the time Forest City amended its complaint to include a claim for breach of the Hawker agreement, two additional pre-payments of $109,000.00 each were past due under the terms of that contract.  Although these pre-payments are unique in that they accrued before Forest City alleged a breach of the Hawker Agreement, the liquidated damages analysis set forth above still applies because the compensation structure of the 2006 Agreements revolved around hours flown, not pre-payments accrued.  No matter when the pre-payments were due, or even paid, the amount of the pre-payment exceeds Century Jets actual damages for the same reasons discussed above.  Therefore, awarding Century Jets the full amount of these two pre-payments would constitute an impermissible penalty under Virginia law.  While it seems that this result is particularly harsh with respect to the payments made or accruing before Forest City even alleged a breach as to the Hawker Agreement, it is a result which appears compelled by Virginia law.

intelligent and probable estimate of damages." *R.K. Chevrolet v. Hayden*, 480 S.E.2d 477, 482 (Va. 1997).

Here, despite Forest City's protests to the contrary, Century Jets has presented evidence that permits the Court to intelligently and reasonably estimate its lost profits damages. First, Century Jets did present accurate information concerning its past earnings under the 2004 and 2006 Agreements by introducing the testimony of Mr. Sonson and accompanying exhibits. This evidence established that Century Jets earned an average gross profit of 32.5% on all flights chartered for Forest City and incurred annual overhead costs attributable to Forest City in the amount of $19,008. (*See* Tr. 287-302; Exs. 1019, 1026 1027, 1030-32.) Specifically, the Court references and relies on the chart prepared by Mr. Sonson that included the following:  (1) a list of flights that Century Jets had provided for Forest City since the end of 2004 through June 2007; (2) the corresponding amounts charged to Forest City for each flight; (3) the cost to Century Jets of providing each flight for Forest City; (4) the gross profits (subject to overhead costs) that Century Jets earned on each flight for Forest City; and (5) the percentage of gross profit (again subject to overhead costs) that Century Jets earned on each flight for Forest City.  (*See* Ex. 1026.)  This chart, which was supported by information from other exhibits in the trial record and with credible testimony, provided the Court with sufficient facts and circumstances to render Century Jets' claimed past earnings under the 2004 and 2006 Agreements to be more than mere speculation or conjecture of its potential lost profits.

Second, while the Court agrees in part with Forest City's argument that Century Jets failed to account for various future possibilities, the Court nonetheless concludes that it can make an intelligent and reasonable estimate of the amount of damages using Century Jets' claimed past earnings and making conservative assumptions about the parties' potential performance under the 2006 Agreements.  The Court notes that much, if not all, of the uncertainty regarding the parties'

potential performance was a result of Forest City's breach and that Forest City should not profit from its breach or wrongdoing.  On the other hand, Century Jets did not adequately address these uncertainties by offering the Court reasonable estimates of Forest City's potential performance through analogy or based on Forest City's past performance under the 2004 or 2006 Agreements. Indeed, Century Jets did not even propose a specific figure for its Lost-Profits Damages Claim.

Balancing these considerations, therefore, the Court will award Century Jets damages using Century Jets' claimed past earnings, but it will make all assumptions regarding the parties' potential performance under the 2006 Agreements in Forest City's favor.  Specifically, the Court assumes that: (1) Forest City would have flown all of its remaining hours under both the Beechjet and Hawker Agreements; and (2) Forest City would have flown all of its remaining hours under the 2006 Agreements at the lower, round-trip rates.

Consequently, the Court derives the total amount of damages that Forest City owes Century Jets to be $1,330,637.50 based on the following calculations:

    (1)    Under the Beechjet Agreement, the Court first multiplied the number of hours that Forest City had not yet flown (1500 hours – 66.3 hours = 1433.7 hours) by the lower, round-trip rate identified in the Beechjet Agreement ($2200) to obtain the total amount of remaining payments that Forest City would have had to make to Century Jets (1433.7 x $2200 = $3,154,140).[34]  This amount was then multiplied by Century Jets' average gross profit (32.5%) to determine Century Jets' gross profit for the remaining hours under the Beechjet Agreement ($3,154,140 x 32.5% = $1,025,095.50).

    (2)    Under the Hawker Agreement, the Court first multiplied the number of hours that Forest City had not yet flown (500 hours – 59.8 hours = 440.2 hours) by the lower, round-trip rate identified in the Hawker Agreement ($2800) to obtain the total amount of remaining payments that Forest City would have had to make to Century Jets (440.2 x $2800 = $1,232,560).[35]  This amount

---

[34]  Per Exhibit 1018, Forest City had flown 66.3 hours under the Beechjet Agreement.

[35]  Per Exhibit 1018, Forest City had flown 59.8 hours under the Hawker Agreement.

was then multiplied by Century Jets' average gross profit (32.5%) to determine Century Jets' gross profit for the remaining hours under the Hawker Agreement ($1,232,560 x 32.5% = $400,582).

(3)     The Court then added the calculated gross profits under the Beechjet and Hawker Agreements ($1,025,095.50 + $400,582 = $1,425,677.50) and reduced that amount by Century Jets' total overhead costs for the five-year period of the 2006 Agreements ($19,008 x 5 = 95,040) for a total $1,330,637.50 ($1,425,677.50 – $95,040.00 = $1,330,637.50).

Forest City, however, may satisfy a portion of the damages it owes Century Jets by using the amounts of principal that currently remain in the third-party escrow account, which equals a total of $88,342.98. (*See* Tr. 160-61; Ex. 50.)[36] So, in other words, in addition to awarding Century Jets the amounts left in the escrow account, Forest City will have to pay Century Jets an additional $1,242,294.52 in damages.

In sum, Century Jets satisfied its burden of proving a portion of its Lost-Profits Damages Claim, by showing a causal connection between Forest City's breach and the damages asserted and by proving the amount of those damages by utilizing a proper method and factual foundation for calculating damages. *See United Const. Workers v. Laburnum Const. Corp.*, 75 S.E.2d 694, 707 (Va. 1953). By offering evidence related to its profits under the flights actually flown under the 2004 and 2006 Agreements, Century Jets showed to a reasonable degree of certainty the amount of lost profits it would have earned under the remaining five-year period of the 2006 Agreements had Forest City not breached.

### 3.     Century Jets Is Not Entitled to Its Interest Damages Claim, But Is Entitled to File A Post-Judgment Motion for Interest Relating to the Damages the Court Has Awarded and for Costs

In its Interest Damages Claim, Century Jets contends that it is entitled to the interest that

_____

[36] Again, Virginia law's prohibition on the award of a penalty mandates this result.

Century Jets would have earned on all of Forest City's pre-payments due under the 2006 Agreements.

As Forest City notes, however, Century Jets here did not provide the Court with any information or historical basis to determine what interest rate should be used in its damages calculation.  By contrast to the evidence it offered in its Lost-Profits Damages Claim, Century Jets merely presented evidence that the interest rate had varied "a lot." (Tr. 299.)  Century Jets, therefore, did not meet its burden of proving its Interest Damages Claim.

Century Jets, appears, however, to be entitled to pre-judgment interest at the applicable statutory rate on the amount of the Court's award, running from the end of each contract year.[37]  In addition, Century Jets also may be entitled to post-judgment interest and costs pursuant to applicable law.  *See Hitachi Credit Am. Corp.*, 166 F.3d at 633 (holding that, unlike pre-judgment interest, which is governed by state law in diversity cases, federal law, 28 U.S.C. § 1961, governs the calculation of post-judgment interest).  Accordingly, within thirty (30) days of the date of this Opinion & Order, Century Jets may file a post-judgment motion for pre- and post-judgment interest and costs.  The motion shall set forth, in detail, the basis of any entitlement to such interest and costs, as well as the exact amount requested and the method used for calculating that amount (which must take into account the damages formula used in this order).  Forest City shall file a response to Century Jets' post-judgment motion within fourteen (14) days of service.  A reply brief will not be

---

[37]  The annual rate of judgment interest under Virginia law is 6 percent.  Va. Code Ann. § 6.1-330.53-54.

necessary.[38]

III.    **CONCLUSION**

For the foregoing reasons, the Court concludes that Forest City was in breach of the 2006

Agreements and orders that Forest City pay Century Jets damages in the amount of $1,330,637.50.


**IT IS SO ORDERED.**

                                        */s/Kathleen M. O'Malley*
                                        **KATHLEEN McDONALD O'MALLEY**
                                        **UNITED STATES DISTRICT JUDGE**


 **Dated:** September 23, 2009

---

[38]  As noted above, Century Jets has consistently declined to seek specific performance of these contracts.  Indeed, the Court confirmed this fact with Century Jets' counsel after hearing the testimony (discussed herein) which supported Century Jets' breach of contract claims.  Given the governing Virginia law regarding liquidated damages discussed above, the decision to eschew a request for specific performance effectively provided a windfall to Forest City, whose promise to make in excess of $5,000,000.00 in payments to Century Jets has been greatly relieved by this Court's damage calculations.  It is, however, a windfall to which Forest City is entitled by law.

-60-